452 F.2d 1239
 146 U.S.App.D.C. 310
 In Re Carol EVANS, Appellant.
UNITED STATES of America
v.
VIOLATIONS OF 18 U.S.C. SECTIONS 231, 241, 245, 371, 1361,
2101, 2102, and other violations, Marlene Renee
Fishlowitz, Appellant.
 Nos. 71-1499, 71-1521.
United States Court of Appeals,
District of Columbia Circuit.
 No. 71-1499.
Argued July 14, 1971.
Decided July 23, 1971.
As amended Sept. 8, 1971.
 
 Mr. Philip Hirschkop, Alexandria, Va., for appellants. Mr. Peter Weisman, a member of the bar of the Supreme Court of New York, pro hac vice, by special leave of Court, was also allowed to argue for appellant in No. 71-1499.
 Mr. Robert L. Keuch, Atty., Department of Justice, Washington, D. C., for appellee.
 Before BAZELON, Chief Judge, and WRIGHT and WILKEY, Circuit Judges.
 BAZELON, Chief Judge:
 
 
 1
 This appeal requires us to resolve a sharp conflict between the power of a grand jury to extract testimony from a recalcitrant witness, and the power of a witness to withhold testimony on the basis of her fourth and fifth amendment rights. The interests on both sides are clearly substantial. While the protections afforded by the fourth and fifth amendments have been acknowledged and nourished by numerous decisions, it is no less clear that the grand jury's effectiveness as a vehicle for investigating crime can be significantly impaired by unwarranted judicial interference. Indeed, one indication of Congress's desire to avoid such unnecessary impairment is the statutory provision which permits us no more than thirty days to resolve appeals of this sort.[1] The precise question presented is one of first impression before this Court. Within the past several months, however, the right of a witness to withhold testimony has been considered by a number of other circuits.[2] Here, as in the analogous cases, appellants sought shelter under the fourth and fifth amendments as well as the wiretap provisions of the 1968 Omnibus Crime Control Act[3] in steadfastly refusing to answer any of the grand jury's questions. The District Court rejected appellants' constitutional and statutory arguments and held both of them in contempt. Even in view of the unquestioned interest in efficiency of grand jury proceedings, we find merit in appellants' contentions and therefore reverse the District Court's judgment.
 
 I.
 
 2
 Appellants Carol Evans and Marlene Fishlowitz[4] were each subpoenaed to appear before a federal grand jury sitting in the District of Columbia. At her first appearance on June 8, Miss Evans refused to testify, insisting that the grand jury's questions were the fruit of an unlawful wiretap. On June 15 Miss Evans was ordered to testify by Chief Judge Sirica of the District Court, but on her return to the grand jury she persisted in refusing to answer the following questions: (1) Have you now or ever had any connection with the People's Coalition for Peace and Justice? (2) What is the May Day Collective and have you ever been a member of that collective, or had any connection with the Collective? (3) Have you ever traveled for, or on behalf of, the People's Coalition for Peace and Justice? (4) Have you ever attended any meetings of members of the May Day Collective in which the May Action Activities were discussed? Because of her assertion of the fifth amendment privilege against self-incrimination, Miss Evans was granted immunity under 18 U.S.C. Sec. 2514 (1970) on June 22. Upon her continued refusal to answer the government's questions she was found in civil contempt, 28 U.S.C. Sec. 1826 (1970), by Chief Judge Sirica. Appellant filed an immediate notice of appeal with this Court, and we ordered her released pending the appeal.[5]
 
 
 3
 The facts with regard to Marlene Fishlowitz are similar. On June 15 she made a motion before Judge Parker of the District Court for disclosure of the government's alleged electronic surveillance against her and to quash the grand jury's subpoena. Judge Parker initially granted her motion, but on June 17 directed that his own order be vacated in view of Rule 77(K) (3) of the District Court which provides that the Chief Judge shall "* * * determine all matters relating to proceedings before the grand jury." On June 29 Chief Judge Sirica denied Miss Fishlowitz's motion, and she appeared before the grand jury on that date. On the basis of several objections, including arguments under the fourth and fifth amendments, Miss Fishlowitz refused to answer any questions. She was granted immunity under Sec. 2514 on the morning of June 30, but continued to resist answering the following questions: (1) Have you ever been a member of the May Day Collective or the People's Coalition for Peace and Justice? (2) Have you ever traveled for or on behalf of the People's Coalition for Peace and Justice or the May Day Collective? (3) Do you know Rene Davis or John Froines? (4) Have you ever attended any meetings or gatherings with Rene Davis or John Froines where the activities of May 3, 1971, were discussed? On that same day Chief Judge Sirica declared appellant in civil contempt under 28 U.S.C. Sec. 1826. Like Miss Evans, she was released pending appeal pursuant to our order.[6]
 
 II.
 
 4
 In defending their refusal to answer the grand jury's questions, both appellants submitted affidavits stating their belief that wiretapping and electronic surveillance had been directed against them and that the grand jury's subpoenas and questions were the fruit of that wiretap. If appellants had presented these assertions in the context of a criminal trial in which they were defendants, there would be no dispute over the procedure to be followed. Under 18 U.S.C. Sec. 2518(10) (a)[7] appellants would be permitted to move for the suppression of evidence derived from an unlawful interception of wire or oral communications. The motion to suppress would provide appellants with a remedy to protect the right embodied in 18 U.S.C. Sec. 2515,[8] which flatly prohibits the introduction of evidence derived from an unlawful wiretap in any trial, hearing, or similar proceeding. And on the basis of appellant's mere assertion that an unlawful interception had been conducted, the government would be required to affirm or deny the occurrence of the alleged wiretap. 18 U.S.C. Sec. 3504.[9] Still, the government insists that none of these procedures are available to these appellants because they were not defendants in a criminal prosecution, but merely witnesses before a grand jury.[10] Furthermore, since they have both been granted immunity from prosecution they are not even potential defendants. The question, therefore, is whether the Omnibus Crime Control Act of 1968 should be interpreted in such a manner that the protections it provides to those who are victimized by unlawful electronic searches would not be available to a "mere witness." While a number of circuits have purported to decide the question, the en banc decision of the Third Circuit in In re Egan[11] is directly in point,[12] and it offers the only sensitive and penetrating analysis of the statute. While I cannot accept all of the assertions in the two opinions which announced the judgment of the court,[13] I am persuaded by much of the court's reasoning.
 
 
 5
 The premise on which our interpretation of the statute must be based is a proper understanding of the statute's purposes. In enacting the wiretap provisions of the Omnibus Crime Control Act, Congress plainly recognized the dangers inherent in the interception of wire and oral communications. The language of the statute as well as the statement of Congressional findings and legislative history are replete with indications of Congress's concern with these dangers.[14] The Act's essential purpose, in our opinion, was to combine a limited and carefully articulated grant of power to intercept communications with an elaborate set of safeguards to deter abuse and to expunge its effects in the event that it should occur. It is thus important to keep in mind not only the powers that Congress was willing to grant, but also those that it refused to make available despite the needs of law enforcement. Moreover, since the Act's prohibitions and limitations were designed, in our view, as a precondition to the acceptability of any wiretapping at all, we must enforce them zealously or else throw Congress's entire conception into jeopardy.
 
 
 6
 There are two provisions of the Act which could be interpreted so as to provide the relief appellants seek. Faced with a comparable choice, a majority of the Third Circuit read Sec. 2515 to permit a witness to withhold testimony where questions propounded by the grand jury were tainted by an unlawful wiretap. By relying on the flat prohibition of Sec. 2515, the majority could avoid decision on the interpretation of Sec. 2518(10) (a). Only two judges expressed the view that a motion to suppress tainted evidence under Sec. 2518(10) (a) could be made by a witness in a grand jury proceeding. While I am sympathetic to the majority's effort to base the decision on the narrowest possible ground, and while I am inclined to accept the majority's interpretation of Sec. 2515, I believe that Sec. 2518(10) (a) offers a stronger ground for decision.
 
 
 7
 In his concurring opinion in Egan, Judge Rosenn builds a substantial case in favor of the interpretation of Sec. 2515 urged by appellants Evans and Fishlowitz. I see no need to reiterate here the steps in his analysis. I should comment, however, on two difficulties that he did not consider.
 
 
 8
 First, Sec. 2515 describes in the most sweeping possible terms a prohibition against the use of evidence tainted by an unlawful wiretap. But the section gives no indication of a specific remedy by which this prohibition is to be enforced. Viewed as a whole, however, the Omnibus Crime Control Act does provide such a remedy-the motion to suppress authorized by Sec. 2518(10) (a). Moreover, the committee report which accompanied the Act explicitly indicated the committee's expectation that Sec. 2518(10) (a) would be read as the remedy for, and hence limitation on, the "right" created by Sec. 2515.[15] Because it is our function to interpret statutes, not committee reports, the committee's language is not conclusive on the question. I tend to place greatest reliance on the language that was formally enacted into legislation, and on its face Sec. 2515 does seem unequivocal in its application. Still, the committee report does no more here than restate the conventional maxim that a statute should be considered as a whole, and for that reason it may be entitled to greater weight. To avoid deciding precisely how much weight the committee's language should be accorded, I would prefer to rest our decision on Sec. 2518(10) (a).
 
 
 9
 The second source of my unease with Judge Rosenn's treatment of Sec. 2515 is related to the first. For just as Sec. 2515 provides no apparent remedy for the right it creates, it also gives no clear indication of the parties in whose favor the right may be invoked. At a minimum, to be sure, the party invoking the section's prohibition must be an "aggrieved person" as defined in Sec. 2510(11).[16] But that definition does not resolve the underlying problem. If Sec. 2515 is capable of standing on its own without reference to Sec. 2518(10) (a), then it is unclear who has standing to move for the exclusion of tainted evidence. It could be argued, of course, that an aggrieved person whose communications have been intercepted should be permitted to intervene in any proceeding where he believes that evidence from the interception is being used, even if he would not otherwise be a participant in any capacity in that proceeding. That approach, despite its obvious shortcomings, is at least consistent with the view that Sec. 2515 has independent force. It is not, however, the approach adopted by Judge Rosenn. Instead, he would draw a distinction between cases where the aggrieved person is already before the court (for example, as a witness), and cases where he is not (for example, where the government introduces the evidence by calling as a witness the agent who carried out the unlawful interception).[17] While that approach might obviate some of the practical difficulties that would arise if any person who thought his telephone had been tapped could intervene, I am not persuaded that the distinction has any relevance to Sec. 2515. If the purpose of that section is, in fact, to preclude the introduction of any evidence tainted by an unlawful wiretap, then it is unclear to me why anything should turn on whether or not the aggrieved person is already before the court or grand jury. Because our decision is grounded on Sec. 2518(10) (a), we do not need to open up this difficult issue of standing.
 
 
 10
 These difficulties in Judge Rosenn's approach are by no means insurmountable, and if no other ground were available I expect that I would resolve my doubts in favor of his position. But since I do not share his apparent uncertainty about the application of Sec. 2518(10) (a) to appellants,[18] I do not find it necessary to decide whether Sec. 2515 carries its own remedy. My conclusion that appellants have standing to move for the suppression of evidence under Sec. 2518(10) (a) minimizes, in my opinion, the difficulty with the legislative history, and makes possible a more coherent interpretation of the statute as a whole.
 
 
 11
 On its face, Sec. 2518(10) (a) would seem to permit a witness before a grand jury to invoke the prohibition of Sec. 2515. It can be argued, however, that the intent of Congress-as indicated by the Senate committee report which accompanied the Act[19]-was to preclude precisely this type of motion to suppress. Indeed, we can see no other substantial argument against our interpretation of the section.[20] Nevertheless, we believe that the argument based on the legislative history must fail for several reasons.
 
 
 12
 First, assuming that the committee report stood clearly for the proposition that grand jury witnesses should have no standing to move for the suppression of evidence, we would have difficulty accepting the report as, in effect, an amendment to the clear-and contrary-language of the statute. While reports are unquestionably entitled to weight in determining the purpose of a statute, they are neither enacted by Congress nor signed by the President, and thus they do not have the force of legislation.[21]
 
 
 13
 Second, whatever the deference an unambiguous committee report deserves, the report at issue here is decidedly unclear. As Judge Adams demonstrates persuasively in his opinion in Egan, the government's interpretation of the committee report is inconsistent with the cases cited by the committee to illustrate its position. While a witness may not normally[22] have a right to enforce limitations on the character of the evidence presented to a grand jury, witnesses have frequently been permitted to withhold testimony from a grand jury on the basis of a constitutional, statutory, or common law privilege.[23] The committee report apparently intended to leave these precedents intact. What the report does suggest is that
 
 
 14
 one who has been illegally wiretapped but is not a witness called by the grand jury may not move to suppress; and that even a witness or defendant who objects to the use of illegal wiretaps in the proceedings may not move to quash the entire proceeding or even an indictment growing out of it.[24]
 
 
 15
 That interpretation of the statute flows naturally from the pertinent case-law.[25]
 
 
 16
 But even if the committee report were entitled to greater weight than we have suggested, and even if the report were unambiguous in its effort to overturn prior judicial decisions, we would still be unable to accept the government's interpretation of Sec. 2518(10) (a). If we were forced to the conclusion that the Omnibus Crime Control Act precluded any attack by a grand jury witness on the admissibility of evidence obtained in violation of the fourth amendment, the statute would present the gravest constitutional difficulties. Again, we are indebted to Judge Adams for his illuminating discussion of the constitutional background, and in particular the implications of Silverthorne Lumber Co. v. United States.[26] Any effort to bar appellants Evans and Fishlowitz from objecting to evidence obtained in violation of the fourth amendment would seem to fly directly in the face of the holding and language of the Silverthorne opinion. In view of the Supreme Court's recent affirmations of Silverthorne,[27] we are unwilling to assume that the case has lost its validity or that Justice Holmes inadvertently unleashed a specious doctrine that can now be casually ignored.[28] But in our opinion we need not explore at this point the precise ramifications of the Silverthorne doctrine. For it is beyond question that we should interpret statutes, wherever possible, so as to avoid significant constitutional difficulties.[29] That principle requires us to interpret this statute to permit an attack by a witness on the admissibility of evidence seized in violation of the fourth amendment.
 
 III.
 
 17
 Since a majority of this panel has concluded that the District Court's summary rejection of appellants' contentions was inconsistent with the protections accorded them by the Omnibus Crime Control Act, the judgment of contempt against both appellants must be vacated. That is not to say, however, that these appellants need never respond to the questions posed by the grand jury. But if the government wishes to pursue the examination of these witnesses, it must be prepared to follow the procedures prescribed by Congress for resolving disputes over the alleged use of unlawful wiretapping.
 
 
 18
 Section 3504(a) (1) of title 18 provides that when a party aggrieved by an unlawful wiretap moves for the suppression of evidence on the basis of the alleged interception, the opponent of the claim must affirm or deny the allegation. Since Sec. 3504(a) (1) is triggered, in our view, by the mere assertion that unlawful wiretapping has been used against a party, the government must make the next move if it still wishes to interrogate these appellants. The government has shown laudable candor in previous cases in acknowledging interceptions when they have occurred, and we are therefore predisposed to accepting as conclusive the government's answer. Thus, if the government now denies the existence of any wiretapping against appellants, they will presumably lose their statutory privilege to remain silent. Whether under some circumstances a witness should be permitted to traverse the government's statement, or whether a witness should be able to shift the burden of going forward back to the government by making some showing to contradict the government's assertion, are questions with great potential impact not only on the viability of the statutory and fourth amendment privilege, but also on the amount of disruption that will be imposed on grand jury proceedings. We leave these questions open for consideration in the first instance by the District Court.
 
 
 19
 The procedures mandated by Congress may impose burdens on federal investigative agencies-who will have to search their records for evidence of a wiretap if they wish to pursue the interrogation of these witnesses-and on the grand jury process. But it is not our function to impeach Congress's finding that these burdens are justified by countervailing interests. Even if it were, we would have to conclude that the Congressional judgment was entirely consistent with a realistic appraisal of the problems actually involved.
 
 
 20
 At the outset, it is important to note that we are concerned here with no more than the marginal burden imposed by our ruling that the statutory privilege is available to witnesses as well as defendants. There is apparently no dispute that Congress intended to have these burdens imposed when a defendant or prospective defendant moves for the suppression of evidence under Sec. 2518(10 (a). Still, it might be agued that the burdens are so substantial that Congress would not have extended the privilege to mere witnesses.
 
 
 21
 In a letter incorporated in the House report on the 1970 Organized Crime Control Act,[30] the Justice Department described in detail the significant effort involved in determining whether a wiretap has been conducted in a particular case. But it is essential to recognize that the efforts described in that letter concerned interceptions conducted before passage of the 1968 Act. Since June 19, 1968, federal agencies have operated under stringent provisions requiring not only the reporting of individual wiretaps, but also the periodic compilation of lists which itemize all wiretaps lawfully undertaken.[31] Even a hurried review of available records should reveal the existence of any wiretaps undertaken after June, 1968.
 
 
 22
 Evidence of pre-1968 electronic surveillance may, admittedly, be more elusive. But here too one must avoid a simplistic approach that exaggerates the real burdens. In the 1970 Organized Crime Control Act Congress explicitly indicated that the usefulness of a particular interception is directly related to the amount of time which has intervened between the interception and the event about which information is sought. According to the Act, wiretaps conducted prior to June, 1968, are presumptively useless in investigating events that occur more than five years after the interception. Accordingly, a party is not permitted to object to the admission of evidence tainted by an unlawful wiretap if the wiretap was conducted more than five years before the event under investigation.[32] Since the grand jury in this case was apparently investigating events that occurred in May, 1971, federal agencies will only have to determine whether a wiretap had been conducted against appellants Evans and Fishlowitz subsequent to May, 1966. Barely more than two years of pre-1968 wiretapping can possibly be relevant to this case. Since we have virtually no information on the nature of the government's record-keeping before 1968, we are reluctant to decide precisely how much effort the government must make to uncover evidence of pre-1968 wiretapping. In the case now before us, however, it seems highly doubtful that federal agents could have had these appellants under electronic surveillance-or even have known of their existence-more than three years ago. The question is thus unlikely to arise. Absent a record on the extent of the burden that would be imposed on the government, we reserve decision on the procedure to be followed if these appellants were to contend that wiretapping had been used against them before 1968.
 
 
 23
 Within several years the usefulness of all wiretaps conducted before 1968 will be entirely exhausted, and the government should be able to resolve these disputes by consulting a readily accessible list. The burden will remain great to be sure, if the government conducts wiretaps which are not properly reported and which are therefore unlawful. But it is hardly surprising that Congress did not strive for a procedure designed to save the government burdensome work when the work would not be burdensome but for the government's violation of the 1968 Act.
 
 
 24
 It should also be clear that the burdens on the grand jury process will not be overwhelming. All witnesses are not hostile to the government's position, and there is no reason to assume that our holding will vitiate the grand jury's ability to gather information. In the present case, for example, the grand jurors heard testimony from a large number of witnesses who showed no hesitation in cooperating with the government. And even where a witness makes a bad faith allegation of wiretapping as a means of obstructing an investigation, the witness can still be compelled to answer as soon as the government demonstrates that no wiretaps were conducted, or that any wiretaps were lawful. Unless the government makes a habit of conducting lawless wiretaps, a motion under Sec. 2518(10) (a) can ordinarily be resolved with little difficulty.
 
 
 25
 The issue might arise more rarely, perhaps, if we required a witness to allege with great specificity exactly what facts underlie his belief that electronic surveillance took place. Thus, we might remand the case to require appellants to make a more elaborate showing if they wished to persevere in their refusal to testify. The short answer to that suggestion is that it contradicts the unambiguous procedure devised by Congress to resolve these cases. Congress directed that the government must affirm or deny the use of wiretapping as soon as an aggrieved party makes a "claim * * * that evidence is inadmissible because it is the primary product" of an unlawful wiretap.[33] The rationale behind this procedure is apparent and persuasive. By hypothesis, electronic surveillance functions properly when its object has no idea that his communications are being intercepted. If we were to hold that a witness could make a "claim" only when he has found an electronic bug in his home, heard mysterious bleeps in his telephone, or rifled the files of the Justice Department, we would merely succeed in encouraging the government to improve its security as well as its technology.
 
 
 26
 Furthermore, Congress may well have recognized that a requirement of more specific pleading would exacerbate the very invasion of privacy which the procedures are designed to remedy. Where a witness alleges that private conversations have been intercepted, it would be a harsh rule that predicated his right to suppress the conversations on his disclosure of the name of the other party, much less the subject of their conversation. Short of revealing this type of information, it is hard to see how a witness could, in many cases, be more specific about the alleged wiretap.
 
 
 27
 Finally, it should be clear that there is far more at stake here than just the smooth functioning of grand jury investigations.[34] The grand jury's operation-and indeed our entire criminal process-could be streamlined if our laws and Constitution left room for draconian efforts to obtain evidence from defendants or witnesses. While perhaps less crude than some of the measures which might be employed, electronic surveillance nevertheless menaces the interests protected by the fourth amendment, and it is surely "the greatest leveler of human privacy ever known."[35] Where it is carried on without legal sanction, Congress wisely concluded that any evidence it yields should not be admissible before a court or grand jury. That result may well be inefficient, but Congress considered it an indispensable prerequisite for insuring that law enforcment officials obey the law.
 
 
 28
 In his dissenting opinion, Judge Wilkey insists emphatically that our decision will impose an intolerable burden on the government. It is entirely possible, as he asserts, that the government's task in "proving a negative" may in some situations be difficult. What he fails to recognize, however, is that the burden on a witness (or defendant) to come forward with more specific information would not merely be difficult-in most cases it would be utterly impossible. The government is handicapped, he argues, because they have too many records. Yet that is little comfort to the witness, who has none.
 
 
 29
 Judge Wilkey suggests that the answer to the problem may lie in computerization of the government's wiretap records. Computers may or may not make these difficult problems disappear. That is not the question. In our effort to implement Congress's plan for strict control of electronic surveillance, we specifically acknowledge that subsequent cases-which may bring to the surface new information about the relative burdens on the government and the moving party-may reveal that Congress misjudged the practical difficulties and that the statutory procedure cannot be carried out as Congress intended. We will have to meet that problem on a concrete record when, and if, it arises. We decide only that on the basis of the information now before us, it seems clear that Congress expected the government to answer appellants' allegations of wiretapping if it wished to pursue the interrogation any further.
 
 
 30
 To be sure, appellants have merely asserted that wiretapping has been used against them. But this is not a case where a reasonable man would be startled to learn that electronic eavesdropping had, in fact, been used. On the contrary, in view of the government's well publicized anxiety about the anti-war activities planned for May, 1971, it would almost be more surprising if some telephones had not been tapped. We do not mean to suggest that a witness can invoke the procedures of Sec. 3504(a) (1) only when an allegation of wiretapping seems plausible on its face. But it is important to avoid misconceptions about the nature of appellants' claim. Their allegations surely cannot be dismissed as patently frivolous; nor could we safely assert that they have been made in bad faith in order to obstruct the grand jury. The government, not appellants, has the information which can substantiate or dissolve their contentions, and for that reason Congress expected that the burden of going forward would shift to the government.
 
 
 31
 Given all the circumstances and the information now available to us, our decision is a cautious and narrow application of the procedures designed by Congress. It appears that Judge Wilkey takes an apocalyptic view of our decision because he differs with Congress fundamentally in his conception of what the problem is. He maintains, in effect, that the practice of government wiretapping has become so widespread-and the responsibility for controlling it so diffuse-that controls are no longer feasible. That, plainly, is precisely what alarmed Congress.[36]
 
 IV.
 
 32
 In view of our holding that the contempt judgment must be reversed because the District Court withheld from appellants the procedural protections to which they were entitled under the Omnibus Crime Control Act, we need not consider appellants' further argument that the purported grant of immunity under Sec. 2514 was defective. Accordingly, we would not reach the question at this juncture except to note our difficulty with the District Court's handling of the issue.
 
 
 33
 The legal standards which control the granting of immunity are well established. While immunity forestalls a criminal prosecution, it may nevertheless fail to hold the witness harmless from embarrassment, infamy, or reprisal. For this reason, and despite the obvious benefits a grant of immunity may offer, Congress has consistently expressed a strong policy against the use of "immunity baths."[37] Thus, a grant of immunity can be effective only if the witness to whom it is extended is then under investigation for one of the crimes itemized in the pertinent immunity statute.[38] With regard to the investigation of crimes not so itemized, Congress has specifically concluded that immunity should not be available as an investigative tool. The determination of whether or not a witness is being investigated for such a crime is essentially a question of fact which must be resolved on the basis of a number of factors. It is clear that the mere conclusory assertion by the government that the statute is being obeyed cannot conclude the inquiry. In general, the issue must be resolved by careful analysis of both the questions put to the witness prior to the application for immunity and the elements of the offense purportedly under investigation. The questions addressed to these appellants[39] are not necessarily inconsistent with an investigation into a possible violation of the anti-riot statute,[40] the only type of investigation which could justify immunity in this case.[41] But in announcing his conclusion that a riot offense investigation was underway, the District Court gave no indication that it had made the requisite inquiry into all of the circumstances. A cursory review of the questions posed to the witness or an uncritical acceptance of the government's assertion would vitiate the Congressional limitations on the reach of the immunity statute. More is required of the District Court.
 
 
 34
 The judgment of the District Court is reversed and the case remanded for proceedings consistent with this opinion.
 
 
 35
 So ordered.
 
 
 36
 J. SKELLY WRIGHT, Circuit Judge (concurring):
 
 
 37
 I concur in the opinion of the court except insofar as it expresses some misgivings as to certain aspects of Judge Rosenn's concurring opinion in In re Egan, 3 Cir., 450 F.2d 199 (decided May 28, 1971) (en banc). I think Judge Rosenn's opinion fully supports our disposition here and on a narrow ground. I would only add to Judge Rosenn's "aggrieved person" discussion the suggestion that cases like United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966), and traditional notions of standing to suppress evidence before grand juries may be inapplicable here, where the aggrieved witness cannot be a defendant. Unlike appellant, a grand jury witness not granted immunity, by asserting his Fifth Amendment right against self-incrimination, may also thereby protect himself against being compelled to testify before the grand jury in violation of his statutory and Fourth Amendment rights.
 
 
 38
 Certainly by granting a witness immunity and thereby protecting her Fifth Amendment rights, the Government cannot then proceed before the grand jury to compel her to participate in the violation of her statutory and Fourth Amendment rights.[1] And when the coercion of jail for contempt is applied to such a witness, the time for intervention by this court has arrived. See Cobbledick v. United States, 309 U.S. 323, 327-328, 60 S.Ct. 540, 84 L.Ed. 783 (1940). Moreover, to suggest that this judgment must be affirmed because a witness has no standing to raise the issue of a violation of her statutory and constitutional rights at the only time she can effectively do so is a "fantastic absurdity." District of Columbia v. Little, 85 U.S.App.D.C. 242, 246, 178 F.2d 13, 17 (1949), affirmed on other grounds, 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599 (1950). See Blau v. United States, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951); Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906). Compare In re Dionisio, 7 Cir., 442 F.2d 276 (1971).
 
 
 39
 I agree that in view of the allegations of illegal electronic surveillance, the judgment of contempt here must be vacated and the case remanded for a hearing to determine whether the questions propounded to appellant before the grand jury resulted from violations of 18 U.S.C. Sec. 2511(1) (Supp. V 1965-1969). In my judgment, the imperative of judicial integrity demands no less.
 
 
 40
 Section 2511(1)[2] of the Omnibus Crime Control and Safe Streets Act makes it a crime for anyone, including officers of government, not only to intercept illegally any wire or oral communication, but also to use the contents thereof for any purpose. Section 2515[3] prohibits the use of the fruit of such crimes in grand jury proceedings. To exact by court order testimony which is the fruit of wiretapping crimes from a witness before the grand jury is not only to involve the courts and the witness, as well as the executive department, in the commission and exploitation of these crimes,[4] but it is to do so in defiance of the explicit command of the statute. And for a court, on petition of the executive department, to sentence a witness, who is herself the victim of the illegal wiretapping, to jail for refusal to participate in the exploitation of that crime in violation of the explicit command of Section 2515 is to stand our whole system of criminal justice on its head.
 
 
 41
 *****
 
 
 42
 * * *
 
 WILKEY, Circuit Judge (dissenting):
 
 43
 What the panel majority does here is to vacate the contempt citations on the flimsiest of allegations-"the mere assertion that unlawful wiretapping has been used against a party"-on a statutory interpretation which Judge Bazelon with commendable candor demonstrates is shot with uncertainties and contradictions, and on a constitutional prop based on an interpretation of a 51-year-old Supreme Court opinion whose three pages had never hitherto been thought to contain so much.
 
 
 44
 It is not only the legal foundation of the majority's action which troubles me, but the inescapable impact on the whole process of criminal justice if this decision is allowed to stand.[1]I. The Facts in the Evans Case
 
 
 45
 Before taking issue with the majority opinion on the law, I feel it desirable to state for the record the extent to which this witness and others in similar cases have gone to frustrate the administration of justice. If it were frequently duplicated, petitioner Evans' conduct before the grand jury on the 8th and 15th of June 1971 would make a mockery of any fair system of procedure.
 
 
 46
 On 8 June she appeared at 2:33 p. m., and from then until 4:30 p. m. when it adjourned, the grand jury was able to ask 11 questions, 3 or 4 at a time. After each set of questions she insisted on her right to go out and consult with her attorney. On her return after presumably receiving his advice, she was asked the same questions again, and refused to answer, except in those instances when she asked to go consult her attorney for the second time on the same question. Her trips out from the grand jury room consumed from 5 to 45 minutes on each trip.
 
 
 47
 On 15 June, after the first questions were put to her, she left the grand jury room at 1:59 p. m. to consult with her attorney and returned at 3:48 p. m. The identical questions were again put; she again asked and received permission to consult her attorney as to the answers, and left the grand jury room. On her return she read a prepared statement raising every conceivable objection, including that the "grand jury questioning violate[s] * * * my right to adequately consult with counsel after each question."[2]
 
 
 48
 To gain an impression of the tenor of her objections, the second question on 8 June (after "What is your name?"-which she never answered) and her response are illuminating:
 
 
 49
 Q. What is your occupation?
 
 
 50
 A. I, Carol Evans, without waiving any and all of my rights under the First, Fifth, Sixth, Ninth and Tenth Amendments, and Articles 2 and 3 of the United States Constitution, and on the advice of Counsel, and without any desire to obstruct the proceedings of this Grand Jury, refuse to testify because I am not properly before this Grand Jury in that upon information and belief, I have been subjected to electronic surveillance and/or wiretap in violation of my rights under the Fourth Amendment to the United States Constitution and under 18 United States Code Sections 2515, 2518, Sub-part 10A and 2510, Sub-part 11, and that the subpoena issued to me and the questions asked are the fruit of that electronic surveillance and/or wiretap.
 
 
 51
 Observe that the objection raised to answering the question, "What is your occupation," was her alleged rights under the Fourth Amendment and certain sections of the United States Code, on the grounds that the question was the fruit of an illegal wiretap. No grounds for this belief were stated by the witness, and why the routine introductory question, "What is your occupation," asked by an Assistant U. S. Attorney in the grand jury room, should ever be thought to be the fruit of an illegal wiretap is beyond me.
 
 
 52
 Nor was petitioner Evans' affidavit filed in the trial court more illuminating:
 
 
 53
 I, Carol Evans, upon information and belief hereby allege under oath that wire tap and/or electronic surveillance have been conducted against me and the organizations with whom I have been associated.
 
 
 54
 And further, I allege that the subpoena issued for me and the questions to be posed by the grand jury are the fruit of that wiretap and/or electronic surveillance.
 
 
 55
 Observe that in neither the statement before the grand jury nor in the affidavit filed is there any allegation what-soever as to any ground of rational belief that the petitioner has been subjected to wiretapping, there is no allegation that any government agency was responsible for the electronic surveillance, nor is there any specification of the persons with whom she believes her conversations were wiretapped, nor in what city in America or abroad, nor on what dates, not even as to during what years. The result, of course, of permitting such allegations as these to halt the grand jury proceedings while contempt citations are obtained, and appealed, and vacated, and left to the trial court for further investigation, is to make the conduct of the Government's business and administration of justice a nightmarish absurdity.
 
 
 56
 When the petitioner-and the majority here adopts this position-urges that all the Government has to do is come in and say there were no wiretaps at all involving the petitioner or that the wiretaps were authorized by court order and therefore petitioner has no complaint, this ignores the enormous labor that is necessary for the various investigative agencies of the federal Government to search their files to establish a negative, even after the passage of the wiretap provisions of the 1968 Crime Control Act,[3] which requires the investigative agencies to get a court order. It is not only the FBI but also various agencies of the Treasury and perhaps other departments which utilize electronic surveillance.
 
 
 57
 Certainly any petitioner alleging an illegal wiretap should be required to allege with particularity as to his belief he was wiretapped, as to the period of time, the places, the persons with whom he conversed, and by whom these conversations were intercepted. As petitioner's allegations stand now, she does not even claim a government agency conducted the electronic surveillance, the period of time could embrace her entire articulate life, no part of the entire globe is excluded, and every person with whom petitioner ever conversed (by phone or otherwise) is within the area the Government must consider before giving its response. If petitioner had been always the specific object of surveillance-and there is nothing in the record to indicate she has been ever an object of surveillance-the government task might be less arduous. But since she has not specified by whom, when, where, and with whom, to which her alleged fears of wiretapping relate, the Government must perhaps review all, certainly a vast quantity, of its records re wiretapping, to answer conscientiously in the negative or to specify what, if any, electronic surveillance involved even peripherally this petitioner.
 
 
 58
 The legislative history of Title VII to the Organized Crime Control Act of 1970[4] gives some idea of the extensive labor required each time a defendant (in this case only a witness who has been granted immunity and can never be a defendant re these matters) asserts that wiretapping is involved in his prosecution. In Alderman v. United States[5] the electronic surveillance record, which the Department of Justice screened for potential relevance in the District Court, comprised approximately 905 typewritten pages.[6] In the two District Court hearings in the Alderman case, on the electronic surveillance allegations alone, 205 attorney man-days were occupied in preparation and hearing.[7] During a period of less than one year from the autumn of 1969 to 9 September 1970, the attorneys of the Department of Justice made 6,750 inquiries of the Federal Bureau of Investigation alone, not counting possibly other federal investigative agencies, to ascertain whether particular individuals had been subjected to electronic surveillance.[8] In addition to processing the 6,750 inquiries, the Department was involved in perhaps 75 to 100 disclosure hearings resulting from defendants' claims that their cases were tainted by unlawful electronic surveillance.[9]
 
 
 59
 These statistics deal with the allegations of defendants. Petitioner here has been granted immunity, cannot be a defendant in this case under investigation or in any related case, and she is only a witness. If every witness were given the right, accorded by the panel majority to petitioner Evans on an unsupported allegation, to compel the District Court to conduct a hearing as to the existence or nonexistence of illegal electronic surveillance, and each and every witness before the grand jury in this type of case were to raise the unsupported allegation of wiretapping, the whole effort of the Government to investigate the existence of any criminal acts would be brought to a grinding halt.[10] 
 
 
 60
 The majority opinion (Part III) devotes considerable pains to an effort to show that somehow the 1968 Crime Control Act would greatly ease the Government's problem. Regretfully, such is not the case. Regretfully, I submit that the majority opinion demonstrably fails to grapple with the real nature of the problem.
 
 
 61
 (1) Making specific the legal procedure for Government electronic surveillance does not mean either that there will be less Government electronic surveillance or that the records the Government keeps for its own internal use will be different. The Government is now required to obtain prior permission and to file certain inventories with the court. Presumably the type of Government wiretapping found necessary before June 1968 will continue necessary, will be no more or no less widespread than before. The difference is that private wiretapping is now strictly prohibited and Government action is only with prior court permission.
 
 
 62
 (2) Most importantly overlooked by the majority, making specific the legal procedure doesn't affect in the slightest the problem of the Government where the witness himself-as probably is true here-was not the object of the permitted surveillance. The number of identified and unidentified passing objects brought into the ken of all authorized directed surveillance is simply unknown. What the majority refers to as "no more than the marginal burden imposed by our ruling that the statutory privilege is available to witnesses as well as defendants" is the real crux of the practical problem. Wiretaps on defendants are the most likely to be easily located, not those on casual witnesses.
 
 
 63
 The majority seems to think that, because prior permission and subsequent report re the specific objects of surveillance are now required, the Government task in determining all interceptions of a witness not the primary object of surveillance is made easier. The two matters are not even related.
 
 
 64
 (3) The majority's observations "The burden will remain great, to be sure, if the government conducts wiretaps which are not properly reported and which are therefore unlawful" and "unless the government makes a habit of conducting lawless wiretaps, a motion under Sec. 2518(10) (a) can ordinarily be resolved with little difficulty" are equally wide of the mark. Legality or illegality has nothing whatever to do with internal Government records available to determine if this or any other witness has been subject to surveillance.
 
 
 65
 I submit that the real answer-toward which the majority opinion is groping, thus illustrating the inadequacy of all judges in dealing with the practical aspects of a problem in the complete absence of empirical data-lies not in the 1968 Crime Control Act requirements of public disclosure but in computerization. To the extent the Government has been able to computerize its data on all persons participating in or mentioned in conversations under surveillance-irrespective of whether such interceptions were legal or illegal, pre- or post-June 1968, court-ordered or not-retrieval will be facilitated. The 1968 Crime Control Act, the majority to the contrary notwithstanding, does absolutely nothing in this regard.
 
 
 66
 If any would argue that the practical consequences of a holding on the legal issues involved here are of no import where the rights of an individual are at stake, this misses the whole relevance of the above discussion of the known empirical data and the easily foreseeable consequences. The legal issues here are what Congress intended in the statute and whether the exclusionary rule derived from the Fourth Amendment should be extended to embrace an admittedly new area. On these legal issues the inevitable consequences of the interpretation of the statute do have a bearing on what Congress intended, and the application of the exclusionary rule is always considered (see Supreme Court cases under Part III) by weighing its probable deterrent effect versus its inevitable denial of justice's right to the truth.
 
 
 67
 To ascribe such an intent to Congress, an intent to thrust this new, totally unprecedented burden on the machinery of justice by changing the character of the centuries old grand jury proceeding to an adversary type, could only be supported by the strongest and clearest statutory mandate. The panel majority makes no pretense of finding this. That Congress had no such intent, and went to extraordinary pains to refute any such implication, is shown by the language of the statutes and their legislative history, to which I now turn.
 
 II. The Statutes and Decisions Thereunder
 A.
 
 68
 In oral argument petitioner's counsel was quite frank in admitting that there is no Supreme Court case which permits a person not a defendant (or not clearly a prospective defendant) to challenge on Fourth Amendment grounds the source of the Government's evidence presented before the grand jury. Petitioner does contend that Silverthorne Lumber Co. v. United States[11] by inference supports her position, this is virtually the sole decisional authority relied on by the panel majority, and this will be dealt with under Part III below. But the essence of my two colleagues' position is that Title III of the Omnibus Crime Control and Safe Streets Act of 1968[12] confers upon petitioner standing to challenge this source of the Government's evidence, when petitioner is only a witness and has been granted full transactional immunity to preclude her from being named as a defendant in this or any related case.
 
 
 69
 Petitioner's case rests primarily upon 18 U.S.C. Sec. 2515, Prohibition of use as evidence of intercepted wire or oral communications, which states:
 
 
 70
 Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter. (Emphasis supplied.)
 
 
 71
 If this were all of the relevant statute, of course, we would have no argument either in the trial court or here, and the Ninth Circuit would not have held three times, and the Fifth Circuit once, that a witness similarly situated to petitioner Evans had no right, on the basis of an allegation of illegal wiretapping, to refuse to answer inquiries before the grand jury.
 
 The Senate Report[13] on Sec. 2515 states:
 
 72
 The provision [imposing an evidentiary sanction to compel compliance with the other prohibitions] must, of course, be read in light of section 2518(10) (a) discussed below which defines the class entitled to make a motion to suppress. It largely reflects existing law. * * * There is, however, no intention to change the attenuation rule. * * * Nor generally to press the scope of the suppression role beyond the present search and seizure law. See Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954).[14] (Emphasis supplied.)
 
 
 73
 Turning now to Sec. 2518, Procedure for interception of wire or oral communications, we find under subsection (10) (a):
 
 
 74
 Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom on the grounds that-
 
 
 75
 (i) the communication was unlawfully intercepted; * * *
 
 
 76
 The first thing to observe here is that the list of persons or bodies before which the evidence is to be received or not to be received is in the exact order as that of Sec. 2515, with two notable omissions: grand jury and legislative committee. This was not inadvertent. When compared with other sections of the same statute, and the expressed intent of Congress, it appears highly significant. It so appears in the Senate Report:
 
 
 77
 Paragraph [2518] (10) (a) provides that any aggrieved persons, as defined in section 2510(11), discussed above, in any trial, hearing or other proceeding in or before any court department, officer, agency, regulating body or other authority in the United States * * * may make a motion to suppress. * * * This provision must be read in connection with sections 2515 and 2517, discussed above, which it limits. It provides the remedy for the right created by Section 2515. Because no person is a party as such to a grand jury proceeding, the provision does not envision the making of a motion to suppress in the context of such a proceeding itself. * * * Nor is there any intent to grant jurisdiction to federal courts over the Congress itself.[15] (Emphasis supplied.)
 
 
 78
 The immediately preceding subparagraph of Sec. 2518, subparagraph (9), now becomes relevant and illuminating:
 
 
 79
 The contents of any intercepted wire or oral communication or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding in a Federal or State court unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved. * * * (Emphasis supplied.)
 
 
 80
 So "each party" is to receive a 10-day notice of wiretap evidence to be used. But, as cited above, we are told in the Senate Report that since "no person is a party as such to a grand jury proceeding," "a motion to suppress in [a grand jury] proceeding" is not envisioned.
 
 
 81
 Subparagraph (9) has a somewhat abbreviated list of proceedings in which wiretap evidence is to be received: "[A]ny trial, hearing, or other proceeding in a Federal or State court." If a grand jury is to be included, it obviously falls within the words "other proceeding." But the Senate Report shows that "grand jury" was not intended to be included within "other proceeding." "'Proceeding' is intended to include all adversary type hearings. * * * It would not include a grand jury hearing. Compare United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966)."[16]
 
 
 82
 Petitioner seizes upon the words "aggrieved person" in Sec. 2518(10) (a) quoted above, and emphasizes that under Sec. 2510(11) "'aggrieved person' means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." Thus the petitioner here puts together the language of Sec. 2518 (10) (a) giving a right to make a motion to suppress to an "aggrieved person," the definition of "aggrieved person" in Sec. 2510(11), and the flat prohibition of use of intercepted wire communications under Sec. 2515 which does list both a grand jury and a legislative committee. My two colleagues accept this rationale.
 
 
 83
 BUT, this line of reasoning takes into account only parts of the statute, and overlooks the deliberate omission of "grand jury" and "legislative committee" in both 2518(10) (a) and 2518(9). The legislative history shows plainly, as quoted above, that the omission of the words "grand jury" and "legislative committee" is purposeful, that there is no intent on the part of Congress to confer a right on any person, aggrieved or not, to suppress electronic surveillance evidence before a grand jury or a legislative committee, whether by affirmatively moving to suppress or passively standing mute. This is unmistakably clear in the legislative history to Secs. 2515, 2518(9), and 2518(10) (a), cited above, and the cumulative effect of this legislative history was not discussed in any part of the Third Circuit opinion in Egan, the sole decision (or part thereof) under this statute supporting the position of my two colleagues.[17]
 
 
 84
 Section 2518(10) (a) defines in what type proceeding and by whom the legality of the Government's wiretap evidence may be challenged. Section 2518(9) requires the Government to furnish those parties who have been subjected to electronic surveillance the authorization for interception of their communications at least 10 days before it is to be used-undoubtedly in order to provide them with an intelligent basis upon which to challenge admissibility. Both sections specifically exclude grand juries. It is wholly inconsistent with this scheme to say that Sec. 2515 is nevertheless intended to permit grand jury witnesses to raise such a challenge. To do so would be to find that Congress had granted standing to raise a question about which it had then withdrawn a right to notice.
 
 
 85
 The significance of both "grand jury" and "legislative committee" being excluded should not be minimized, nor the fact that the holding of my two colleagues here must apply pari passu to a congressional committee hearing. If a witness before a congressional committee can trifle with the committee as this petitioner did with the grand jury in this case, and thrust upon the Government the burden of establishing that no electronic surveillance led to the questions asked her-all on the basis of the majority's interpretation of the 1968 Crime Control Act-this may be an eye opener for those legislators who enacted these statutes.
 
 
 86
 With all deference to Judge Bazelon's analysis of the statute, and his effort to interrelate his to that of Judge Adams and Judge Rosenn, I submit that, while recognizing "two difficulties" with Judge Rosenn's position, he has fallen into error similar to that of those judges. Judge Bazelon first discusses Sec. 2515 separately, finds this a doubtful base for his position, then moves to consider Sec. 2518(10) (a) separately,[18]-without reference to Sec. 2518(9), Sec. 2520, Sec. 2510(11) and the Supreme Court's footnote in Alderman, supra. Nowhere does Judge Bazelon mention the significance of the omission of both "grand jury" and "legislative committee" from Secs. 2518(9) and (10) (a). (Nor did Judges Adams and Rosenn.)
 
 
 87
 When it is remembered that the Senate Report specifically explained, after discussing the "grand jury" omission, "Nor is there any intent to grant jurisdiction to federal courts over the Congress itself" (pp. 1244-1245, supra), and that the Report specifically states more than once that both grand juries and legislative committees are excluded, it is hard to understand Judge Bazelon's assertion that the Report is "in effect, an amendment to the clear-and contrary-language of the statute." Nor is his reference to the Report's "effort to overturn prior judicial decisions" sustainable. The Report is replete with citation of decisions and reiteration of such phrases as "reflects existing law," "no intention to change * * * to press the scope of the suppression role beyond the present search and seizure law" (pp. 1244-1245,
 
 
 88
 Another section of the 1968 Crime Control Act throws light on the congressional intent not to confer a right on a nondefendant to challenge the sources of the Government's evidence before a grand jury or a legislative committee. The Congress did not leave an "aggrieved person," whether defendant, prospective defendant, or witness, entirely remediless. In my opinion, not only did Congress as clearly and specifically as possible rule out the use of the exclusionary rule in a grand jury or legislative committee proceeding, as shown above, but under Sec. 2520, Recovery of civil damages authorized, it did provide alternative relief: supra).[19]
 
 
 89
 Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and (2) be entitled to recover from any such person(a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;
 
 
 90
 (b) punitive damages; and
 
 
 91
 (c) a reasonable attorney's fee and other litigation costs reasonably incurred.
 
 
 92
 A good faith reliance on a court order or on the provisions of section 2518(7) of this chapter shall constitute a complete defense to any civil or criminal action brought under this chapter.
 
 
 93
 Congress did not intend to do a vain thing in providing a remedy for petitioner Evans and others similarly situated; it meant for the remedy to be utilized. For the Senate Report states: "The scope of the remedy is intended to be both comprehensive and exclusive, but there is no intent to preempt parallel State law." It further added, "Injunctive relief, with its attendant discovery proceedings, is not intended to be available (Pugach v. Dollinger, 365 U.S. 458, 81 S.Ct. 650, 5 L.Ed.2d 678 (1961))."[20] (Emphasis supplied.)
 
 
 94
 Another portion of the legislative history illuminates the civil remedy afforded petitioner here. With reference to Sec. 2518(8), "[s]ubparagraph (d) places on the judge the duty of causing an inventory to be served by the law enforcement agency on the person named in an order authorizing or approving an interception. * * * Through its operation all authorized interceptions must eventually become known at least to the subject. He can then seek appropriate civil redress, for example, under Sec. 2520, discussed below * * *."[21] Under the statutory scheme of regulating wiretapping, all wiretapping must ultimately be revealed; if it has been unauthorized or in any way unlawful, the person whose communication was intercepted has been afforded a civil remedy which the Senate Report specifies "is intended to be both comprehensive and exclusive."
 
 
 95
 This, coupled with Secs. 2518(9) and 2518(10) (a) specifically omitting "grand jury" and "legislative committee" from a list of proceedings in which a motion to suppress may be made, and the legislative history stating explicitly that such omission was intended and that neither a grand jury nor a legislative committee is included as a proceeding in which such a motion can be made, leads inexorably to the conclusion that a mere witness such as petitioner Evans here, who has been granted comprehensive transactional immunity, has no standing whatsoever to refuse to answer questions in the grand jury on the ground that any electronic surveillance was in violation of law.
 
 B.
 
 96
 All of the Court of Appeals decisions since the enactment of the 1968 Crime Control Act, with one exception, so hold.
 
 
 97
 The Ninth Circuit has had occasion to speak directly on the matter three times.[22] In Carter v. United States[23] the Ninth Circuit had before it challenges by witnesses to the investigation conducted by the grand jury in regard to possible violations of 18 U.S.C. Secs. 2101 and 2102, likewise involved in the case at bar. The Ninth Circuit held that each appellant was before the grand jury as a witness, not under indictment, not accused, and had been granted immunity. Hence in his capacity as a witness, he lacked standing to question the constitutionality of the statute (Blair v. United States).[24] He was not entitled to raise objections of incompetency or irrelevancy such as a party might raise (Nelson v. United States).[25] Finally, of direct relevance to the case at bar, the court held on the allegation "that the questions asked appellants were based upon such wiretapping, the assumption does not help appellants. As witnesses, they have no standing to question the source of the government's information. It will be time enough to do that if any of them should ever become a defendant, a most unlikely event in view of the immunity granted them."[26]
 
 
 98
 In the consolidated cases of United States v. Gelbard and United States v. Parnas[27] the appellants relied on both the Fourth Amendment ground and on a construction of the statute here involved. The witnesses refused to answer any questions based on information gained by the Government from wiretapping. The Ninth Circuit cited Carter in its holding that:
 
 
 99
 A witness before a grand jury lacks standing to challenge a statute on constitutional grounds unless the statute directly bears upon his privilege against self-incrimination. * * * Section 2518 is not in that category.
 
 
 100
 It appears to be settled that a witness in a grand jury proceeding has no right to resort to a court to secure authoritative advance determination concerning evidentiary matters that arise, or may arise, or to exclude evidence to be used in such a proceeding. Cobbledick v. United States, 309 U.S. 323 [60 S.Ct. 540, 84 L.Ed. 783] (1940); Costello v. United States, 350 U.S. 359 [76 S.Ct. 406, 100 L.Ed. 397] (1956) and Lawn v. United States, 355 U.S. 339, [78 S.Ct. 311, 2 L.Ed.2d 321] (1958).[28]
 
 
 101
 And in regard to the contention on the construction of the statute here involved, the court stated, "[W]e agree with the Fifth Circuit's decision in Dudley v. United States * * *. 'that nothing in the Omnibus Act, particularly Sec. 2518(10) (a) created a statutory exception which would permit a preindictment motion to suppress evidence that might be presented to the grand jury."'[29] The Ninth Circuit further relied on portions of the legislative history in regard to Secs. 2518(10) (a) and 2518(9), discussed under A above.
 
 
 102
 In the last of the trilogy, Bacon v. United States[30] the Ninth Circuit apparently considered the ground well plowed and the law well settled, dismissing petitioner's allegations "that the information obtained by illegal wiretaps led to her being subpoenaed and was used in framing questions put to her" with a reference to a rejection of an identical contention in Gelbard and Parnas, whose Petition for Rehearing had been denied the day before Bacon was decided (24 June 1971).
 
 
 103
 In these cases in the Ninth Circuit there were seven different judges involved in Carter, Parnas, and Bacon, plus three different District Judges,[31] all of whom without difficulty reached the same conclusion on the issues and fact situations identical with those in the case at bar.
 
 
 104
 Nor did the three judges of the Fifth Circuit who considered the same issue in Dudley v. United States[32] have any difficulty in reaching the same conclusion: "We agree with the district court that nothing in the Omnibus Act, particularly Sec. 2518(10) (a), created a statutory exception which would permit a pre-indictment motion to suppress evidence that might be presented to a grand jury, much less an exception permitting an appeal from the denial of such a motion. The legislative history of the Act supports this conclusion."[33]
 
 
 105
 In fact, not one of the ten Circuit Judges or five District Judges who had heard and passed on this issue had any difficulty holding that a witness before a grand jury had no standing, either under the Fourth Amendment or under the 1968 Crime Control Act, to raise any question as to the source of the Government's evidence, illegal wiretapping or not, until the Third Circuit considered the case of Sister Joques Egan.[34] As Judge Bazelon carefully footnotes: "[T]he court's holding is simply that Sec. 2515, properly interpreted, precluded a finding of contempt in the situation presented by that case"-and this holding, the only portion of the 62 pages of opinion receiving the vote of five of the seven judges participating, comprises exactly two typewritten pages. Judge Rosenn's separate concurring opinion received the vote of three other judges, and may likewise be taken as the opinion of the majority of the court.
 
 
 106
 The two-page holding of the Third Circuit opinion took Sec. 2518 as a reenactment of old Sec. 605 of the Communications Act of 1934, which had been held in Nardone v. United States[35] to call for the exclusionary rule on wiretap evidence. In this portion the Third Circuit opinion did not discuss the implications of other sections of the same 1968 Crime Control Act which clearly must be read with Sec. 2515, as both the content of the statute itself and the legislative history discussed above clearly demonstrate. Judge Rosenn's concurring opinion, joined in by three other judges, described the holding of the court thus: "I believe that, regardless of the interpretation accorded Sec. 2518(10) (a), the aggrieved person should be able to stand mute and, in the event of a subsequent civil contempt proceeding, raise the unequivocal prohibition of Section 2515 as a defense to a finding of contempt, unless the prosecutor can show an untainted independent basis for the questions sought to be asked. This is the rule of this case."[36]
 
 
 107
 With all due deference to the ingenious suggestion that a witness does not need to make a motion to suppress under Sec. 2518(10) (a) or the Fourth Amendment, all the witness really needs to do is to stand mute, a procedure followed by petitioner Evans here, I venture to suggest that this rationale seeking to avoid the language of the statute and its legislative history may be subject to two flaws. First, this position would seem to slide the witness over to a Fifth Amendment ground for his refusal to answer, rather than rest on the Fourth. To stand mute and decline to answer rather than move to suppress or to bar testimony on the ground it is derived as the fruit of an illegal wiretap, smacks more of the Fifth than it does of the Fourth Amendment. The witness-petitioner Evans in the case at bar, as in Egan, has been granted complete transactional immunity protecting her from any subsequent prosecution, thus undercutting any ground of objection based on the Fifth Amendment.
 
 
 108
 A second flaw may be that while the witness-petitioner Evans, like the witness-petitioner Egan, is a witness in a criminal investigation by a grand jury, the same line of reasoning would apply if the witness standing mute were a witness called at trial by a defendant.[37] If the witness has an individual personal right on either the Fourth or Fifth Amendment, it applies in all proceedings, whether the witness' testimony is sought by the prosecution or by the defendant. In that event, what happens to a defendant's Sixth Amendment constitutional right to have compulsory process for testimony? All private wiretapping is now illegal, and whether the alleged wiretapping was illegal government or private action, under the construction of the statute advocated by the panel majority here, the witness could assert his personal rights and decline to answer.
 
 
 109
 Although not directly in point, one more expression of views (referred to by the Ninth Circuit in both Caldwell and Weinberg, note 22, supra) should be noted as having considerable relevance here. In Garland v. Torre[38] Judge (now Mr. Justice) Stewart was weighing rights under the First Amendment against the obligation of a witness to testify. While the panel majority has not considered any First Amendment rights to be involved here, I would think that the rights under no amendment transcend those embodied in the First, hence Mr. Justice Stewart's comments may put the issue here in perspective. He said,
 
 
 110
 But freedom of the press, precious and vital though it is to a free society, is not an absolute. What must be determined is whether the interest to be served by compelling the testimony of the witness in the present case justifies some impairment of this First Amendment freedom * * *
 
 
 111
 * * * Freedom of the press, hard won over the centuries by men of courage, is basic to a free society. But basic too are courts of justice, armed with the power to discover truth. The concept that it is the duty of a witness to testify in a court of law has roots fully as deep in our history as does the guarantee of a free press. * * *
 
 
 112
 Without question, the exaction of this duty impinges sometimes, if not always, upon the First Amendment freedoms of the witness. Material sacrifice and the invasion of personal privacy are implicit in its performance. The freedom to choose whether to speak or be silent disappears. But "[t]he personal sacrifice involved is a part of the necessary contribution of the individual to the welfare of the public." Blair v. United States * *.
 
 
 113
 If an additional First Amendment liberty-the freedom of the press-is here involved, we do not hesitate to conclude that it too must give place under the Constitution to a paramount public interest in the fair administration of justice.[39]
 
 
 114
 I do not hesitate to conclude that the Government in the public interest has a right to the testimony of this witness, petitioner Evans, and that there is nothing whatsoever expressed by Congress in the 1968 Crime Control Act which was intended to override this "paramount public interest in the fair administration of justice."
 
 C.
 
 115
 One related statute remains to be considered. The majority opinion seems to assume (no authority is cited) that the witness-petitioner's "mere assertion that an unlawful interception had been conducted"[40] against her and the organizations with which she had been associated is sufficient to "trigger" the government's obligation under 18 U.S.C.A. Sec. 3504(a) (1) (Supp.1971), first, to ascertain, and then to come forward and reveal any and all wiretaps involving the petitioner. Such an unsupported assertion, however, does not qualify as a "claim" as required under Sec. 3504(a) (1). A "claim" clearly entails more than, as here, a "mere assertion" of illegality.
 
 
 116
 The majority's outright assumption of the equivalence in meaning of the terms "claim" and "mere assertion", without reference to any authoritative supporting evidence, demonstrates the fragility of petitioner's case. If their assumption is found to be erroneous, then petitioner's case must fall without more, since petitioner simply failed to make her case in the trial court. That the majority opinion itself recognizes the critical import of this assumption is evident from language throughout the opinion reiterating my colleagues' unsupported assertion of the validity of petitioner's unsupported assertion.[41]
 
 
 117
 The meaning of the term "claim" as it is used in the 1970 statute, is illuminated by the legislative history accompanying it. This history reveals a Congressional desire for specificity. Congress' Special Findings, requiring that claims that evidence was obtained by the exploitation of unlawful acts be of sufficiently recent vintage (five years or less) in order that there be some degree of certainty as to the unlawful source of such evidence,[42] indicate a Congressional intent that such alleged unlawful acts must therefore be set forth. In addition where as here, the petitioner has been granted immunity and thus cannot be a defendant in any prosecution arising out of this or any related case and where she is a witness, the requirement that she plead more specifically her allegations of illegality can work no hardship on her and can only conform to the intent of the 1970 statute. If the witness is unable to state a single fact or ground of suspicion, as is the situation here, then all the world-including even my two colleagues-must know that she is making up a story out of whole cloth.
 
 
 118
 Under this statute there are, in effect, two requirements for raising a "claim": first, the petitioner must have standing to challenge the allegedly unlawful conduct. This would require the petitioner to plead, with at least some degree of specificity, his relation to the allegedly unlawful event and its harmful effect on him. In the instant case the witnesspetitioner, by her mere assertion that illegal electronic surveillance has been conducted against her and the organizations with which she has been associated, with no supporting allegations or proof, does not specify her particular relation to such surveillance nor does she specify what difficulties, constitutional or otherwise, it creates for her. While under the Federal Rules of Civil Procedure, "facts" as such need not be pleaded,[43] "* * * a short and plain statement of the claim showing that the pleader is entitled to relief * * *" is required by Rule 8(a) (2). As Mr. Justice Black stated for a unanimous Court in Conley v. Gibson, "* * * all the Rules [Fed.Rules Civ.Proc.] require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[44]
 
 
 119
 The witness-petitioner here also fails to specify how she is aggrieved, as required to establish standing, by the employment of evidence allegedly obtained from unlawful acts of electronic surveillance. As a witness and having been granted immunity from prosecution in any case arising out of this investigation or in any related case, the petitioner can suffer no adverse legal or penal consequences from the use of such evidence by the grand jury here. The legislative history accompanying 18 U.S.C.A. Sec. 3504(a) (1) (Supp.1970) is relevant in this regard in that it speaks in terms of defendants and an adversary context, not, as here, in terms of witnesses before a grand jury or in any other proceedings:
 
 
 120
 Title VII [Sec. 3504] intends to limit disclosure of information illegally obtained by the Government to defendants [emphasis added] who seek to challenge the admissibility of evidence because it is either the primary or indirect production of such an illegal act.[45]
 
 
 121
 Paragraph (1) [of Sec. 3504(a)] provides that upon a claim by an aggrieved party that evidence is inadmissible because it is the primary product of an unlawful act, or because it was obtained by the exploitation of an unlawful act, the opponent of the claim must affirm or deny the occurrence of the alleged unlawful act. Under this provision, upon a charge by the defendant with standing to challenge the alleged unlawful conduct [emphasis added], the Government would be required to affirm or deny that an unlawful act involving electronic surveillance had in fact occurred.[46]
 
 
 122
 In regard to any invasion of the witness-petitioners' privacy, assuming the occurrence of unlawful electronic surveillance directed against her, as a ground for her being aggrieved, this has already taken place and is insufficient, by itself, to give the witness-petitioner, with her grant of immunity, standing to challenge the admissibility of such evidence before a grand jury investigation directed against others and not her. Whatever interest she may have in preventing the use against others of evidence which she alleges was unlawfully obtained is outweighed by the public interest in the administration of justice, as more fully discussed under III, infra. The Supreme Court observed in Alderman v. United States:
 
 
 123
 [T]here is a substantial difference for constitutional purposes between preventing the incrimination of a defendant through the very evidence illegally seized from him and suppressing evidence on the motion of a party who cannot claim this predicate for exclusion. * * * The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. * * * But we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth.[47]
 
 
 124
 In the instant case, the witness-petitioner merely alleges, in the words of her affidavit filed in the trial court, that "upon information and belief" electronic surveillance has been conducted against her and the organizations (nowhere specified) with which she has been associated. Nowhere does she allege with any degree of specificity the nature of such surveillance or the harmful effects which it might have had upon her. As such, and as a witness, not a defendant, who has been granted immunity from prosecution in any case arising out of this investigation or in any related case, the witness-petitioner here lacks the requisite standing to qualify as a "person aggrieved by an unlawful search and seizure," as stated in Rule 41(e) of the Federal Rules of Criminal Procedure and as employed by the Supreme Court in Jones v. United States.[48] While, as the Court in Alderman admits:
 
 
 125
 Of course, Congress or state legislatures may extend the exclusionary rule and provide that illegally seized evidence is inadmissible against anyone for any purpose[49] * * *. But for constitutional purposes, we are not now inclined to expand the existing rule that unlawful wiretapping or eavesdropping, whether deliberate or negligent, can produce nothing usable against the person aggrieved by the invasion.[50]
 
 
 126
 Congress has not done so and did not intend to do so by means of this 1970 statute.[51]
 
 
 127
 The second requirement for raising a claim under 18 U.S.C.A. Sec. 3504(a) (1) (Supp.1971) is that the claimant must specify whether the evidence which he alleges is inadmissible is either the primary product of an unlawful act, the illegality of which he must show, or that it was obtained by the exploitation of an unlawful act, the illegality of which he must also demonstrate. This is supported by the legislative history, which states in pertinent part that:
 
 
 128
 Under paragraph (2) [of Sec. 3504(a)] disclosure of the information shall be required to be made to a defendant who has demonstrated the illegality of the electronic surveillance [emphasis added] (occurring prior to June 19, 1968) and his standing where such information is or 'may be' relevant to a claim of inadmissibility. In cases where the electronic surveillance occurred on or after June 19, 1968, disclosure is mandatory where illegality and standing are demonstrated. [emphasis added[52]
 
 
 129
 The converse would presumably likewise be true: Where illegality and standing have not been demonstrated, disclosure is not mandatory. Here the majority cannot require the government to come forward on the basis of a "mere assertion."
 
 
 130
 This accords with the view expressed in Nardone v. United States, in which Mr. Justice Frankfurter, writing for the Court, stated that "[t]he burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed."[53] It is also consistent with Alderman v. United States, in which the Court stated that "[t]he United States concedes that when an illegal search has come to light, it has the ultimate burden of persuasion to show that its evidence is untainted. But at the same time petitioners acknowledge that they must go forward with specific evidence demonstrating taint [emphasis added]."[54] While the instant case involves a witness held in civil contempt, 28 U.S.C.A. Sec. 1826 (Supp.1971), the same burden may be said, by analogy, to rest on the petitioner here. Conrad observes with respect to affirmative defenses in civil proceedings "[t]he burden is on one who asserts an affirmative plea or a controverted counterclaim to establish it by appropriate proof. Typical defenses under this rule are * * * illegality. * * *"[55]
 
 
 131
 A like analogy can be found in Rule 12(b) (6) of the Federal Rules of Civil Procedure. The motion to dismiss for failure to state a claim upon which relief can be granted, as provided therein, which is the appropriate method for testing the legal sufficiency of a complaint, indicates that pleadings which contain mere allegations of illegality are insufficient for going forward. "For the purposes of the motion, the well-pleaded material allegations of the complaint are taken as admitted; but conclusions of law [emphasis added] or unwarranted deductions of fact are not admitted."[56] The witness-petitioner's mere allegation of illegality here would therefore not be admitted under this test. "* * * [M]ere characterization in a complaint of conduct as unlawful does not meet the test of sufficiency."[57]
 
 
 132
 The witness-petitioner here has thus failed to meet the requirements for raising a "claim" under 18 U.S.C.A. Sec. 3504(a) (1) (Supp.1971), since she lacks the requisite standing to challenge the allegedly unlawful conduct of which she complains, and she has not even attempted to demonstrate the illegality of the surveillance of which she complains.
 
 
 133
 III. Exclusionary Rule under the Fourth Amendment
 
 
 134
 As indicated at the outset, petitioner's principal reliance is on the 1968 Crime Control Act[58] as interpreted by a majority of the Third Circuit in Egan.[59] Petitioner treats the Crime Control Act as a statutory extension of the exclusionary rule under the Fourth Amendment. Petitioner concedes frankly that there is no Supreme Court case permitting a nondefendant, or one who is not even a prospective defendant, to challenge the source of the Government evidence before the grand jury.
 
 
 135
 Before engaging in a brief discussion of those Supreme Court cases under the Fourth Amendment of tangential relevance, it is appropriate to examine the fundamental purpose of the exclusionary rule and the logic of its application here.[60]
 
 
 136
 This case, I submit, demonstrates the irrationality of the exclusionary rule at its worst. Petitioner Evans and her battery of counsel are now fighting tooth and nail to prevent her from being compelled to testify before a grand jury inquiring into the conduct of John Doe, Richard Roe and others-concerning which petitioner has been granted complete immunity. Whatever harm has accured to petitioner has already occurred-as petitioner's counsel at one point in oral argument inadvertently admitted, but sought hastily to retract. If there has been an illegal interception, the contents of it are now irretrievably within the ken of government agents. Investigative leads from such interception have doubtless long since been followed up. What the Government now seeks is to bring relevant portions of this information, either that obtained from leads or possibly even from the conversation of the petitioner (although this is not indicated by the questions asked), to the consideration of that venerable public institution, the grand jury. Petitioner now invokes the exclusionary rule of the Fourth Amendment, not for her own protection and for her own vindication, but to block the prosecution of John Doe, et al. How does the application of the exclusionary rule to block the investigation of John Doe vindicate the rights of the witness-petitioner Evans?Nor can she contend that her appearance before the grand jury will subject her to indignity or additional harm. Whether the electronic surveillance-there is not a shred of evidence there was any-of petitioner was authorized or not, the intrusion into petitioner's privacy was the same. If any there was, it has already occurred, and now her testimony before the grand jury will be no more than "one of the duties which the citizen owes to his government [by supporting] the administration of justice by attending its courts and giving his testimony whenever he is properly summoned," in the words of Chief Justice Hughes.[61] On which Mr. Justice Stewart commented, "Material sacrifice and the invasion of personal privacy are implicit in its performance."[62]
 
 
 137
 If petitioner Evans can show herself an aggrieved person under Sec. 2518(10) (a) in a civil action for damages under Sec. 2520, by reason of unauthorized illegal wiretapping by any government agent, then she has her remedy (said by the Senate Report to be comprehensive and exclusive), and presumably her monetary damages will be awarded in an amount sufficient to compensate her for any intrusion into her privacy which may have occurred. Of what possible advantage is it to petitioner Evans to block the Government's investigation of John Doe? What satisfaction does the witness obtain? Does the witness obtain the satisfaction of retaliation against government authority, because of her suspicion she has been subjected to electronic surveillance, by blocking the possible prosecution of John Doe, et al.? Is this why the witness-petitioner Evans here is not interested in the civil action for monetary damages provided by the Congress to be exclusive and comprehensive under Sec. 2520?
 
 
 138
 Bear in mind that the Fourth Amendment itself provides no penalty for its violation, the exclusionary rule based on it is 100% judge-made beginning in the Supreme Court in 1914, the extension of the exclusionary rule to bar the prosecution of John Doe by sustaining the witness-petitioner Evans' alleged right not to testify certainly does not make restitution to the witness Evans in any way, and to the extent she seeks to invoke the traditional rationale for suppression of evidence, that of deterring future official misconduct, the decision whether or not to apply exclusionary sanctions does not turn on any considerations of vindication of her personal rights but rather on a judicial evaluation of the effectiveness of extending exclusionary sanctions in achieving the desired deterrence. Here, even apart from the notorious ineffectiveness of the exclusionary rule as a deterrent, the exercise of this sanction would, in any event, have little deterrent effect on investigative agency conduct now that electronic surveillance under court order has been specifically authorized by statute. A far more logical and appropriate remedy for the witness-petitioner Evans would seem to be a civil action for damages which would bring her restitution, and at the same time permit the public to have the benefit of her evidence before the grand jury against John Doe, et al. This is, in my judgment, what the Congress had in mind when it provided for the civil remedy for damages under Sec. 2520 and said that this was to be "both comprehensive and exclusive" and that "[i]njunctive relief * * * is not intended to be available."[63]
 
 
 139
 As the Chief Justice of the United States has recently observed, "If an effective alternative remedy is available, concern for official observance of the law does not require adherence to the Exclusionary Rule. Nor is it easy to understand how a court can be thought to endorse a violation of the Fourth Amendment by allowing illegally seized evidence to be introduced * * * if an effective remedy is provided against the government." Bivens v. Six Unknown Named Agents.[64] Here, the Congress has carefully provided a remedy in the form of civil damage actions. It therefore seems anomalous to me, in the face of the history of the ineffectiveness of the exclusionary rule in accomplishing its objective of deterring unlawful official conduct, so amply documented by Chief Justice Burger in Bivens, for this court to strain to extend the suppression remedy in an area where Congress itself has refused to do so and has plainly provided an alternative remedy.
 
 
 140
 Turning to other Supreme Court cases under the Fourth Amendment, to my mind the most relevant to the present controversy is Alderman v. United States,[65] the only Supreme Court decision discussing the 1968 Crime Control Act, Title III. Where the petitioner was seeking to exclude evidence against himself as a defendant, but the evidence had been seized from a third party, the Supreme Court declined to extend the exclusionary rule:
 
 
 141
 What petitioners appear to assert is an independent constitutional right of their own to exclude relevant and probative evidence because it was seized from another in violation of the Fourth Amendment. But we think there is a substantial difference for constitutional purposes between preventing the incrimination of a defendant through the very evidence illegally seized from him and suppressing evidence on the motion of a party who cannot claim this predicate for exclusion.[66]
 
 
 142
 In Alderman there was thus something of a triangle between (1) the government agency's action in seizing the evidence, (2) the person from whom the evidence was seized, and (3) the defendant moving to suppress the evidence. The Supreme Court declined to extend the exclusionary rule in this triangular situation, distinguishing it from what might be termed the straight-line or reciprocal situation in which the government agency seized the evidence illegally from the defendant himself and then sought to use against him the "very evidence illegally seized from him."[67]
 
 
 143
 In the case at bar we have another triangular situation: (1) the government agency's action in allegedly unauthorized electronic surveillance, (2) as a result of which information was obtained from petitioner, but (3) the use of the evidence against a third party, John Doe (not the petitioner). On a parallel line of reasoning here, I submit that the court should refuse to suppress the evidence obtained by a government agency, from petitioner, for use against a third party, just as in Alderman the Supreme Court declined to suppress evidence obtained by the government agency, from a third party, for use against the defendant. Whatever rights may be conferred by the statute on a witness at trial, we should not extend the exclusionary rule on a Fourth Amendment ground here in our triangular situation, just as the Supreme Court refused to extend the exclusionary rule in Alderman in the triangular situation there.
 
 
 144
 Alderman has another relevance to the case at bar. In justifying its refusal to extend the exclusionary rule under the Fourth Amendment, the Supreme Court said: "We do not deprecate Fourth Amendment rights * * * nor should those who flout the rules escape unscathed. In this respect we are mindful that there is now a comprehensive statute making unauthorized electronic surveillance a serious crime,"[68] and at that point footnoted the Omnibus Crime Control and Safe Streets Act of 1968, saying, "Not only does the Act impose criminal penalties upon those who violate its provisions governing eavesdropping and wiretapping, * * * but it also authorizes the recovery of civil damages by a person whose wire or oral communication is intercepted, disclosed, or used in violation of the Act," citing Sec. 2520 discussed above. In the very next footnote the Supreme Court in Alderman observed that Congress had not extended the exclusionary rule by this statute, and that "[t]he Act's legislative history indicates that 'aggrieved person,' the limiting phrase currently found in Fed.R.Crim.Proc. 41(e) should be construed in accordance with existent standing Rules. See S. Rep.No.1097, 90th Cong., 2d Sess., at 91, 106,"[69] precisely those sections of the legislative history I have discussed above.
 
 
 145
 Hence, from Alderman I derive the assurance that not only would the Supreme Court decline to extend the Fourth Amendment-based exclusionary rule to this particular triangular situation comparable to that in Alderman, but likewise the Supreme Court looks to the Crime Control Act of 1968 as providing an alternate remedy, i. e., civil damages, to that of the exclusionary rule. Further, I conclude from Alderman that "aggrieved person" is equivalent to "person aggrieved" under Rule 41(e), and that this witness-petitioner Evans is not a party before this grand jury, because there are no parties before grand juries.
 
 
 146
 Petitioner's counsel stated at oral argument that although there was no Supreme Court case squarely holding that a nondefendant or a mere witness could challenge the source of government evidence before the grand jury, yet Silverthorne Lumber Company, Inc., et al. v. United States[70] was the closest case in point. In brief petitioner asserts: "Silverthorne * * * explicitly held that a grand jury witness could not be compelled to comply with a subpoena derived in any part from the fruits of a Fourth Amendment violation." Silverthorne was given subpoenas duces tecum to produce certain corporate records before a grand jury which was investigating him and his father. The reason that Silverthorne did not have to comply, and that the corporation was not required to produce the books and records which would serve to incriminate father and son personally, was not derived from their standing as grand jury witnesses. The reason was that, prior to the subpoenas challenged, their personally owned corporation had been the victim of a search and seizure "without a shadow of authority." On the application of the Silverthornes, the documents were held to have been unlawfully seized and were ordered returned to their rightful owner. After having acquired the documents illegally, having been forced to return them to their lawful owner, the Government then sought to profit from the evidence originally illegally obtained by subpoenaing the individual witness to produce the documents. This the Supreme Court refused to permit.
 
 
 147
 Since Silverthorne was decided in 1920, it would be astonishing some 51 years later to find that this case established the law that a mere grand jury witness had standing to challenge the source of government evidence allegedly derived from an illegal search and seizure. The Silverthornes had established the illegality of the seizure of the evidence in an independent proceeding prior to the new grand jury subpoenas duces tecum, the Silverthornes were the object of the grand jury's investigation, and they had certainly been granted no immunity as has the petitioner Evans here. The witness-petitioner Evans is in a completely different category in all three respects. If Silverthorne has meant for 51 years all that petitioner now says it does, long since we would have had witnesses refusing to testify because of illegal wiretaps or for other searches and seizures alleged illegal under the Fourth Amendment.
 
 
 148
 Judge Bazelon's reliance on Silverthorne (p. 1246) is a reliance on a dictum in Silverthorne, not on its holding. This dictum-"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all"-if followed, would make the exclusionary rule of the Fourth Amendment of universal applicability in every proceeding under all circumstances. This the Supreme Court has not done, it has not followed the dictum of Silverthorne; Costello v. United States,[71] Lawn v. United States,[72] United States v. Blue[73] and Alderman v. United States[74] are but some of the holdings to the contrary.
 
 
 149
 Nor do I understand how we "avoid significant constitutional difficulties (Judge Bazelon, p. 1247) by reading this statute "to permit an attack by a witness on the admissibility of evidence seized in violation of the fourth amendment," i. e., to extend the exclusionary rule to a situation which even petitioner's counsel admits is not directly covered by any Supreme Court decision in his favor. On the statute as I interpret it, there is nothing whatsoever inconsistent with any previous holding of the Supreme Court, and the legislative history shows that the Congress thought likewise. The Supreme Court decisions declining to extend the exclusionary rule, of which Alderman, supra, is only the most recent, sustain this view.
 
 
 150
 Cases subsequent to Silverthorne make clear its inherent limitations apparent from the recital of the operative facts above.
 
 
 151
 In United States v. Blue,[75] Justice Harlan wrote for a unanimous Court:
 
 
 152
 Even if we assume that the Government did acquire incriminating evidence in violation of the Fifth Amendment, Blue would at most be entitled to suppress the evidence and its fruits if they were sought to be used against him at trial.[76]
 
 To which was footnoted:
 
 153
 It does not seem to be contended that tainted evidence was presented to the grand jury; but in any event our precedents indicate this would not be a basis for abating the prosecution pending a new indictment, let alone barring it altogether. See Costello v. United States, 350 U.S. 359 [76 S.Ct. 406, 100 L.Ed. 397]; Lawn v. United States, 355 U.S. 339 [78 S.Ct. 311, 2 L.Ed.2d 321]; 8 Wigmore, Evidence Sec. 2184a, at 40 (McNaughton rev. 1961).
 
 
 154
 Hence, evidence obtained illegally, even in violation of a constitutional right, may be used before a grand jury. The Court refused to abate the prosecution, which it would have done if evidence which Blue could have suppressed before the grand jury had been used. Blue had no such right to move to suppress any evidence before a grand jury, and neither does this witness-petitioner here.
 
 
 155
 A mere witness given immunity from prosecution, as petitioner here, logically stand in a weaker position than an indicted defendant, particularly when the rationale of the Court's rule in Blue is examined. There Blue had sought to bar the prosecution altogether, on which the Court's opinion commented: "So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book."[77] The Court's wariness of extending the exclusionary rule was again underscored by Justice White in Alderman: "Neither those cases nor any others hold that anything which deters illegal searches is thereby commanded by the Fourth Amendment."[78] Far from extending the exclusionary rule, I believe we should heed the advice of Chief Justice Burger that, even apart from the existence of some alternative remedy for illegal searches and seizures, "the time has come to re-examine the scope of the Exclusionary Rule and consider at least some narrowing of its thrust so as to eliminate the anomalies it has produced."[79]
 
 
 156
 Extending the exclusionary rule on a Fourth Amendment ground to apply to the witness-petitioner would have the same damaging impact feared by Justices Harlan and White, and described at length by Chief Justice Burger, as what has already occurred in these grand jury proceedings makes crystal clear. The majority ruling here, giving witnesses such as these a right to challenge and litigate at the grand jury phase the source of the Government's evidence, a new right not intended by Congress and never known before Egan, adds yet another tool to the expanding arsenal of legal weapons to which obstructionist elements may resort to frustrate the ends of justice. I would affirm the judgment of the District Court holding the witnesses in civil contempt until they answer the grand jury's questions.
 
 
 
 [1]
 28 U.S.C. Sec. 1826(b) (1970): "Any appeal from an order of confinement [of a witness who has refused to testify without just cause] under this section shall be disposed of as soon as practicable, but not later than thirty days from the filing of such appeal." The appeal in this case was filed on June 23, 1971
 
 
 [2]
 Bacon v. United States, 446 F.2d 667 (9th Cir. 1971); United States v. Gelbard, 443 F.2d 837 (9th Cir. 1971); In re Egan, 450 F.2d 199 (3d Cir. 1971) (en banc); cf. United States v. Weinberg, 439 F.2d 743 (9th Cir. 1971); Dudley v. United States, 427 F.2d 1140 (5th Cir. 1970). See generally note 12, infra
 
 
 [3]
 18 U.S.C. Secs. 2510-20 (1970)
 
 
 [4]
 This Court has not heard argument in the Fishlowitz case (No. 71-1521). But the parties in this case are represented by the same counsel as are acting on the Evans appeal (No. 71-1499), and the parties in Fishlowitz have stipulated that they will be bound by our disposition of the Evans case. Stipulation filed, July 21, 1971. Accordingly, the issues raised by the two appellants are considered together in this opinion
 
 
 [5]
 No. 71-1499, Order of June 24, 1971 (per curiam)
 
 
 [6]
 No. 71-1521, Order of July 1, 1971 (per curiam)
 
 
 [7]
 "Any aggrieved person in any trial, hearing, or proceeding * * * may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that-(i) the communication was unlawfully intercepted * * *." 18 U.S.C. Sec. 2518(10 (a) (1970)
 
 
 [8]
 "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court [or] grand jury * * * if the disclosure of that information would be in violation of this chapter." 18 U.S.C. Sec. 2515 (1970)
 
 
 [9]
 "(a) In any trial, hearing, or other proceeding in or before any court, grand jury * * * or other authority of the United States-(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act * * *" 18 U.S.C. Sec. 3504(a) (1) (1970)
 
 
 [10]
 Brief for Appellee at 7
 
 
 [11]
 450 F.2d 199 (3d Cir. 1971) (en banc)
 
 
 [12]
 In United States v. Gelbard, 443 F.2d 837 (9th Cir. 1971), the wiretaps at issue had been authorized by the district court pursuant to 18 U.S.C. Sec. 2518, 443 F.2d at 838, and the decision is therefore inapposite. Appellants did not allege in that case that electronic surveillance had been conducted without any prior judicial sanction. Bacon v. United States, 446 F.2d 667 (9th Cir. 1971) presented a more closely analogous factual setting, but the court's opinion merely dismissed appellant's contention with a citation to Gelbard
 The Fifth Circuit's decision in Dudley v. United States, 427 F.2d 1140 (5th Cir. 1970), on which the Ninth Circuit relied in Gelbard, was also inapplicable to the situation before us. There too the wiretaps conducted against appellants had been expressly authorized by the district court.
 
 
 [13]
 Seven judges participated in the court's decision in Egan. Judge Adams wrote a lengthy and well-reasoned opinion in which he upheld appellant's claim on three grounds, finding Sec. 2515, Sec. 2518(10) (a), and the fourth amendment independently sufficient to vacate the judgment of contempt. One judge concurred in all of Judge Adams's opinion. Three judges concurred only in that part of the opinion which dealt with Sec. 2515. One of this latter group, Judge Rosenn, filed a separate concurring opinion in which three of his colleagues joined. That opinion found Sec. 2515 a sufficient basis to vacate the judgment of contempt, and did not reach the other arguments. Judge Gibbons, joined by one other member of the court, dissented. Thus, the court's holding is simply that Sec. 2515, properly interpreted, precluded a finding of contempt in the situation presented by that case. Five judges accepted that proposition
 
 
 [14]
 See, e. g., S.Rep.No.1097, U.S.Code, Cong. & Ad.News, 90th Cong., 2d Sess. p. 2156 (1968); Act of June 19, 1968, Pub.L. 90-351 Sec. 802(d) 82 Stat. 212, quoted at 18 U.S.C. at 1168 (1970) (Congressional findings)
 
 
 [15]
 S.Rep.No.1097, 90th Cong., 2d Sess., 1968 U.S.Code, Cong. & Ad.News p. 2185 ("The provision must, of course, be read in light of section 2518(10) (a) * * * which defines the class entitled to make a motion to suppress."), p. 2195 ("This provision [Sec. 2518(10) (a)] must be read in connection with sections 2515 and 2517 * * * which it limits.")
 
 
 [16]
 "'[A]ggrieved person' means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." 18 U.S.C. Sec. 2510(11) (1970). Cf. Alderman v. United States, 394 U.S. 165, 171-176, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)
 
 
 [17]
 450 F.2d at 219:
 "Assuming the remedy in Section 2518(10) (a) to be unavailable to a grand jury witness, a prosecutor would presumably be able to call as a grand jury witness an agent who made or listened to illegal tapes, or he could introduce the tapes themselves into evidence (although in both instances he would be violating the law), and no party to the illegally-overheard conversations would have a remedy by way of a motion to suppress. That is not this case, however. I think it is quite a different matter when, as here, the prosecutor attempts to elicit the testimony of an aggrieved person himself. When this occurs, I believe that, regardless of the interpretation accorded Section 2518(10) (a), the aggrieved person should be able to stand mute * * *" [Emphasis in original.]
 
 
 [18]
 450 at 219 n. 5
 
 
 [19]
 See S.Rep.No.1097, 90th Cong., 2d Sess. 106 (1968): "Because no person is a party as such to a grand jury proceeding, [Sec. 2518(10) (a)] does not envision the making of a motion to suppress in the context of such a proceeding itself. Normally, there is no limitation on the character of evidence that may be presented to a grand jury, which is enforceable by an individual. (United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1965).) There is no intent to change this general rule. It is the intent of the provision only that when a motion to suppress is granted in another context, its scope may include use in a future grand jury proceeding."
 
 
 [20]
 Objections based on Sec. 2510(11) and on the failure of Sec. 2518(10) (a) to make specific reference to grand jury proceedings are, in our opinion, decisively rebutted by Judge Adams in his Egan opinion. 450 F.2d at 203. In dissent, Judge Wilkey suggests that our decision may be incompatible with a defendant's sixth amendment right to compulsory process. See page 225 infra. But that clause does not grant the defendant a right to the testimony of a witness, but only to the process necessary to bring him before the court. 8 J. Wigmore, Evidence Sec. 2191, at 69 (McNaughton rev. 1961) ("this right does not override and abolish such exemptions and privileges as may be otherwise recognized by common law or statute.") (Emphasis in original). There is thus no conflict with our holding in this case
 
 
 [21]
 Cf. United States v. Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961)
 
 
 [22]
 The term is used by the Senate committee in its report on Sec. 2518(10) (a). See note 19 supra
 
 
 [23]
 See, e. g., Blau v. United States, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951) (husband-wife privilege); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920) (fourth amendment privilege); Caldwell v. United States, 434 F.2d 1081 (9th Cir. 1970), cert. granted, 402 U.S. 942, 91 S.Ct. 1616, 29 L.Ed.2d 109 (1971) (first amendment privilege); In re Dionisio, 442 F.2d 276 (7th Cir. 1971) (fourth amendment privilege); United States v. Weinberg, 439 F.2d 743 (9th Cir. 1971) (dictum) (husband-wife privilege); United States v. Judson, 322 F.2d 460 (9th Cir. 1963) (attorney-client privilege). See generally Comment, The Rights of a Witness Before a Grand Jury, 1967 Duke L.J. 97, 121-122
 
 
 [24]
 In re Egan, 450 F.2d 199 at 205 (3d Cir. 1971), (Adams, J.)
 
 
 [25]
 See note 23 supra
 
 
 [26]
 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920) (Holmes, J.) ("The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.") See generally Judge Adams's discussion of the constitutional question, 450 F.2d at 210-211
 
 
 [27]
 See, e. g., Harrison v. United States, 392 U.S. 219, 222, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968)
 
 
 [28]
 Compare In re Egan, 450 F.2d 199 at 229 (3d Cir. 1971) (Gibbons, J., dissenting), ("Justice Holmes used the words * * * but the juice of their context has been squeezed from them, and the husks used as a premise for a syllogism he never contemplated.")
 
 
 [29]
 Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936), (Brandies, J., concurring), quoting from Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932). See also United States v. Rumely, 345 U.S. 41, 47, 73 S.Ct. 543, 546, 97 L.Ed. 770 (1953) (Frankfurter, J.) ("With a view to observing this principle of wisdom and duty, the Court very recently strained words more than they need to be strained here.")
 
 
 [30]
 Letter from Will Wilson, Assistant Attorney General, Criminal Division, to Emmanuel Celler, Chairman, House Committee on the Judiciary, Sept. 9, 1970, reprinted in H.R.Rep.No.91-1549, 91st Cong., 2d Sess. (1970), U.S.Code, Cong. Sec. Ad.News, 91st Cong., 2d Sess. pp. 4061-62 (1970)
 
 
 [31]
 18 U.S.C. Sec. 2519 (1970). Congress itself has acknowledged the difference in burden between uncovering evidence of wiretaps carried out before 1968 and those undertaken after passage of the 1968 Act. See 18 U.S.C. Sec. 3504(a) (2), (3) (1970)
 
 
 [32]
 18 U.S.C. Sec. 3504(a) (3) (1970). For the purposes of this appeal we naturally assume the constitutionality of this fiveyear limitation on the exclusionary rule. But see H.R.Rep.No.91-1549, 91st Cong., 2d Sess. (1970), U.S.Code, Cong., & Ad. News, 91st Cong., 2d Sess. pp. 4080-81 (1970) (dissenting views of Reps. Conyers, Mikva & Ryan)
 
 
 [33]
 18 U.S.C. Sec. 3504(a) (1) (1970) (emphasis added)
 
 
 [34]
 Compare Bazelon, New Gods For Old: "Efficient" Courts in a Democratic Society, 46 N.Y.U.L.Rev. 653 (1971)
 
 
 [35]
 United States v. White, 401 U.S. 745, 756, 91 S.Ct. 1122, 1128, 28 L.Ed.2d 453 (1971) (Douglas, J., dissenting)
 
 
 [36]
 See page 1243 supra
 
 
 [37]
 See generally In re Bart, 113 U.S.App.D.C. 54, 304 F.2d 631 (1962) (Wright, J.)
 
 
 [38]
 See, e. g., In re Vericker, 446 F.2d 244 (2d Cir. 1971), a case closely analogous to the one before this Court. The Second Circuit failed to reach appellant's arguments concerning unlawful wiretapping because it held that the grant of immunity had been defective. The court noted that "it is no matter that the acts would have been criminal under other statutes not within the permissible grant of immunity." That same principle is applicable in this case. But see Licata v. United States, 429 F.2d 1177 (9th Cir.), vacated as moot, 400 U.S. 938, 91 S.Ct. 239, 27 L.Ed.2d 243 (1970)
 The crimes itemized in Sec. 2514-the immunity statute at issue here-are all of the offenses listed in Sec. 2516 and violations of the wiretapping provisions of the 1968 Act.
 
 
 [39]
 See p. 1241 supra
 
 
 [40]
 18 U.S.C., Sec. 2101 (1970)
 
 
 [41]
 Of the offenses under investigation by the grand jury, only a violation of 18 U.S.C. Sec. 2101 would fall within the offenses itemized in Sec. 2516
 
 
 [1]
 In a criminal context, Fourth and Fifth Amendment rights ordinarily are reciprocal. But no one has suggested that one is not entitled to protection because the other is fully protected, as by a grant of immunity. Indeed, as Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 530, 87 S.Ct. 1727, 1732, 18 L.Ed.2d 930 (1967), makes clear: "It is surely anomalous to say that the individual * * * [is] fully protected by the Fourth Amendment only when the individual is suspected of [or may be charged with] criminal behavior," See District of Columbia v. Little, 85 U.S.App.D.C. 242, 246, 178 F.2d 13, 17 (1949), affirmed on other grounds, 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599 (1950)
 
 
 [2]
 18 U.S.C. Sec. 2511(1) (Supp. V 1965-1969) which reads in pertinent part:
 "(1) Except as otherwise specifically provided in this chapter any person who-
 "(a) willfully intercepts, endeavors to intercept or procures any other person to intercept or endeavor to intercept, any wire or oral communication;
 "(c) willfully discloses, or endeavors to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection; or
 "(d) willfully uses, or endeavors to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection;
 shall be fined not more than $10,000 or imprisoned not more than five years, or both."
 
 
 [3]
 18 U.S.C. Sec. 2515 (Supp. V 1965-1969) which reads:
 "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."
 
 
 [4]
 See Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920); Sorrells v. United States, 287 U.S. 435, 456-457, 53 S.Ct. 210, 77 L.Ed. 413 (1932); Olmstead v. United States, 277 U.S. 438, 483-485, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Mr. Justice Brandeis, dissenting); McNabb v. United States, 318 U.S. 332, 345, 63 S.Ct. 608, 87 L.Ed. 819 (1943). Compare Olmstead v. United States, supra, 277 U.S. at 470, 48 S.Ct. 564 (Mr. Justice Holmes, dissenting)
 
 
 [1]
 In my view this case is one which under ordinary circumstances properly should have been considered by this court en banc, as was done by the Third Circuit in Egan. But because, as noted by Judge Bazelon, we are obligated to decide this case by 23 July, because this is the season when some of the judges are on their annual vacation, and because of a realistic appraisal that with a split in opinion now between the Fifth and Ninth Circuits on one side and the Third and this Circuit on the other, it is highly likely that the Supreme Court will decide these issues, no judge asked for en banc consideration. Indeed, no judge had an opportunity, as the order and opinions are being issued on the day the statutory period expires
 Because of the time and season factors, the opinions herein were written on the basis of an informal exchange of views, with no opportunity for a careful study and reconciliation of differing opinions as we customarily have.
 The same limitations have required my omission of any detailed discussion of the facts in Miss Fishlowitz's case. Suffice it to say that not only petitioner here but also two other witnesses, Marlene Fishlowitz and Jerry Coffin, called at about the same time as the petitioner and questioned by the grand jury regarding the Mayday activities used the same tactics of frustration-requesting to consult with their attorney after each question and ultimately refusing to answer on the same primary ground, i. e., that they believed their subpoenas had been issued as a result of illegal electronic surveillance. In fact, the grand jury transcript shows witness Coffin's objection phrased so closely to this petitioner's-quoted at note 2, infra-that it is a fair inference they were reading from the same prepared statement.
 Apparently in recognition of the concertedness of these witnesses' behavior, the Justice Department has stipulated with counsel for Miss Fishlowitz (who is also counsel for this petitioner) that the disposition of this case will determine that of the contempt case against her. Likewise, the Justice Department has so far apparently refrained from proceeding against Coffin, despite his refusal to answer, pending resolution of this case-a resolution, I might add, that is yet nowhere in sight.
 
 
 [2]
 During part of the time she was absent on 15 June she was present with her counsel at a hearing before Chief Judge Sirica, which began at 2:45 p. m. and concluded at 3:40 p. m. Prior to that time she had gone to the courtroom of District Judge Parker. On 8 June she alleged in the grand jury room that during part of the time she had been absent she had been to the Court of Appeals, which ordered her return to the grand jury room
 The complete text of Mrs. Evans' objection was:
 I cannot answer that question because on advice of counsel, the answer might tend to incriminate me, and upon information and belief, my subpoena was issued as a direct or indirect result of illegal electronic surveillance, and my belief that the question has been framed in whole or in part from information obtained directly or indirectly from illegal electronic surveillance.
 And I further cannot answer on the grounds that this subpoena and Grand Jury questioning violate my rights of speech and association, my right of privacy, my right to have counsel present with me in the Grand Jury room, my right to adequately consult with counsel after each question.
 And further, that this Grand Jury is abusing its function in that it's conducting an investigation for the Federal Bureau of Investigation, and that the Grand Jury, an aspect of the judicial branch of the Government, is performing the function of the executive branch of Government.
 And that my rights under the due process clause of the Fifth Amendment are violated, and that the Grand Jury questioning has been conducted in an abusive manner by the attorneys of the Justice Department.
 
 
 [3]
 Omnibus Crime Control and Safe Streets Act, Title III; 18 U.S.C. Secs. 2510-2520 (1968)
 
 
 [4]
 Organized Crime Control Act of 1970, Title VII, Part B; 18 U.S.C. Sec. 3504 (1970)
 
 
 [5]
 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)
 
 
 [6]
 H.R.Rep.No.1549, 91st Cong., 2d Sess. 82 (1970)
 
 
 [7]
 Id., at 92
 
 
 [8]
 Id
 
 
 [9]
 Id
 
 
 [10]
 I am cognizant of the views expressed by Judge Rosenn and three others judges in the Third Circuit, to the effect that there is no real burden on the Government to come up with a simple "yes" or "no" answer in regard to the existence of wiretapping and supply any called for data. (Egan, 450 F.2d at 199) There is no evidence that Judge Rosenn and his colleagues considered the empirical data cited in this opinion, or indeed any data on previous experience at all. Nor do my two colleagues here
 This view was sharply challenged by Judge Gibbons and Judge Aldisert in dissent. (at 450 F.2d 221) They further noted:
 This assumption, supported by no empirical foundation, undermines the only public policy which could possibly be weighed in favor of the witness privilege. By hypothesis the invasion of privacy about which a given witness complains has already occurred. The only public policy consideration favoring imposition of an evidentiary sanction on the government is that such a sanction is needed to deter anticipated future violations. (Footnote omitted.) If violations are, as the majority opinion assumes, likely to be rare, how does the need for the sanction outweigh both the need for the testimony and the harm of litigating third party claims?
 
 
 [11]
 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920)
 
 
 [12]
 18 U.S.C. Secs. 2510-2520 (1968)
 
 
 [13]
 S.Rep.No.1097, 90th Cong., 2d Sess. 96 (1968). Because of the origin of the Act and the parliamentary procedure under which it was considered, there was no House Report on these relevant portions of the Act
 
 
 [14]
 Id
 
 
 [15]
 Id., at 106
 
 
 [16]
 Id., at 105
 
 
 [17]
 With some degree of hesitancy, Judge Bazelon would appear to accept this position of the petitioners as an alternative holding since he states in his opinion that "By relying on the flat prohibition of Sec. 2515, the majority could avoid decision on the interpretation of Sec. 2518(10) (a)", and "* * * while I am inclined to accept the majority's interpretation of Sec. 2515, I believe that Sec. 2518(10) (a) offers a stronger ground * * *", and "Judge Rosenn builds a substantial case in favor of the interpretation of Sec. 2515 urged by appellants Evans and Fishlowitz." But then Judge Bazelon "comment[s], however, on two difficulties that he did not consider." Judge Wright would forthrightly accept the interpretation given Sec. 2515 by Judge Rosenn's concurring opinion in Egan. Both interpretations overlook, as I have pointed out above, the overall scheme of Title III. Judge Bazelon seems to recognize this since the "two difficulties" relate to viewing the statute "as a whole"
 
 
 [18]
 I respectfully submit that the approach favored by Judge Bazelon, interpreting as it does Sec. 2518(10) (a) in vacuo while at the same time seeking to minimize the effect of any contrary legislative history, is not only subject to that same criticism in that it does not even attempt to harmonize the effects of Secs. 2515, 2518(9), 2518(10) (a), and 2520-all pertinent sections of the same statute which should be read together-but also patently ignores Congress' express purpose in expounding at length in the Senate Report on the provisions of Title III. The legislative history to Title III begins as follows:
 Because of the complexity in the area of wiretapping and electronic surveillance, the committee believes that a comprehensive and in-depth analysis of title III would be appropriate in order to make explicit congressional intent in this area. S.Rep.No.1097, 90th Cong., 2d Sess. 88 (1968). (Emphasis supplied.)
 Certainly no legislative history has the same force as the statute itself. No one argues that. What any legislative history, and in particular this legislative history regarding the complicated area of electronic eavesdropping seeks to do is explain what Congress intended the words of the statute to mean-an intent I believe we are bound to follow.
 
 
 [19]
 Judge Bazelon mentions (pp. 1245-1246) the Senate Report's use of the qualifying word "normally" in stating "there is no limitation on the character of evidence that may be presented to a grand jury, which is enforceable by an individual," (footnotes 19 and 23) and then refers to witnesses' "constitutional, statutory, or common law privilege." As Judges Gibbons and Aldisert made clear in Egan (450 F.2d pp. 225)-"Congress was well aware of the distinction between exclusionary rules of evidence and witness privileges"-these are personal privileges easily determinable by a limited inquiry as to status or relationship, e. g., husband-wife, attorney-client, or the privilege against self-incrimination
 
 
 [20]
 S.Rep.No.1097, note 13, supra, at 107
 
 
 [21]
 Id., at 105
 
 
 [22]
 Two other Ninth Circuit cases during this same period bear peripherally on the instant case, but were not decided on any construction of the statute here involved. In Caldwell v. United States, cert. granted, 402 U.S. 942, 91 S.Ct. 1616, 29 L.Ed.2d 109 (1971), 434 F.2d 1081 (1970), the District Court had denied the motion of appellant to quash the grand jury's subpoena on the ground that the appellant lacked standing to raise the Fourth Amendment contention. Because of its disposition of Caldwell under the First Amendment, the court did not reach the Fourth Amendment ground. The court held that the public's First Amendment right to be informed would have been jeopardized by requiring a reporter to submit to secret grand jury interrogation, unless the Government had prior to his attendance demonstrated a compelling need for the witness' presence. Thus a witness was excused attendance, but on the ground of the public's right right to know. This might be compared to the public's right to know through the historic grand jury inquiry as to whether criminal acts had been committed in the case at bar
 United States v. Weinberg, 439 F.2d 743 (1971), involved a grand jury investigation of a violation of 18 U.S.C. Sec. 2101. The witnesses who had been granted immunity under the statute, also involved here, did not claim that any construction of the statute itself gave them a right to refuse to answer the grand jury questions, but instead relied upon Fourth Amendment constitutional grounds. The Ninth Circuit dismissed this contention by saying,
 [C]ompelled grand jury testimony is neither a search for, nor seizure of, oral statements in the sense envisioned by the Fourth Amendment. * * *
 "The grand jury does not need to have probable cause to investigate; rather its function is to determine if probable cause exists. And if probable cause is not required to investigate, it follows that probable cause is not required to make the preliminary showing necessary to call a witness whose testimony may shed light on criminal activity which the grand jury must investigate if the national inerest is to be effectively served." 439 F.2d, at 749.
 
 
 [23]
 417 F.2d 384 (9th Cir. 1969), cert. denied, 399 U.S. 935, 90 S.Ct. 2253, 26 L.Ed.2d 807 (1970)
 
 
 [24]
 250 U.S. 273, 279, 281-283, 39 S.Ct. 468, 63 L.Ed. 979 (1919)
 
 
 [25]
 201 U.S. 92, 115, 26 S.Ct. 358, 50 L.Ed. 673 (1906)
 
 
 [26]
 417 F.2d 384, 388 (9th Cir. 1969) (citations omitted)
 
 
 [27]
 443 F.2d 837 (9th Cir., 1971, rehearing denied 1971)
 
 
 [28]
 Id., at 838
 
 
 [29]
 Id
 
 
 [30]
 446 F.2d 667 (9th Cir., 1971)
 
 
 [31]
 The District Court in Caldwell, note 22, supra, likewise decided the question of the statute and the Fourth Amendment, although the Ninth Circuit explicitly did not in that case
 
 
 [32]
 427 F.2d 1140 (5th Cir. 1970)
 
 
 [33]
 Id., at 1141-1142
 
 
 [34]
 In re Egan, 450 F.2d 199 (3rd Cir. en banc, 1971)
 
 
 [35]
 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937). See also Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939)
 
 
 [36]
 Note 34, supra, 450 F.2d at 219-220
 
 
 [37]
 This was pointed out by Judge Gibbons' dissent in Egan, at 223, and note 5. He answered the argument advanced by the majority opinion here (note 20) by saying: "It is inconceivable that the right of a criminal defendant to compulsory process for the attendance of witnesses guaranteed by that amendment (VI) is subject to the unrestrained power of Congress to create privileges * * * the constitutional interpretation announced in the majority opinion will operate both ways * * * The majority opinion may in the future be cited as authority for congressional authority to erode the compulsory process guarantee."
 
 
 [38]
 259 F.2d 545 (2d Cir. 1958), cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958)
 
 
 [39]
 Id., at 548-549 (citations omitted)
 
 
 [40]
 Majority opinion, p. 1242
 
 
 [41]
 Their observations to this effect are as follows:
 Since Sec. 3504(a) (1) is triggered, in our view, by the mere assertion that unlawful wiretapping has been used against a party, the government must make the next move if it still wishes to interrogate these appellants. [emphasis added] [Majority opinion, p. 1247]
 Congress directed that the government must affirm or deny the use of wiretapping as soon as an aggrieved party makes a "claim * * * that evidence is inadmissible because it is the primary product" of an unlawful wiretap. 18 U.S.C.A. Sec. 3504(a) (1) (Supp.1971) [emphasis added in majority opinion p. 1249]
 The majority also purport to distinguish the decision of the Ninth Circuit in United States v. Gelbard and United States v. Parnas, 443 F.2d 837 (9th Cir. 1971) from the instant case on the grounds that, as they state, "[a]ppellants did not allege in that case that electronic surveillance had been conducted without any prior judicial sanction." [Majority opinion, p. 1242, n. 12]. This distinction rests on their assumption of the equivalence in meaning of the terms "claim" and "mere assertion." However the witness-petitioner here nowhere alleges that electronic surveillance has been conducted without any prior judicial sanction. She merely asserts the occurrence of an unspecified illegality.
 
 
 [42]
 Organized Crime Control Act of 1970, Title VII, Part A, Sec. 701; 1970 U.S.Code Cong. and Adm.News, p. 4469
 
 
 [43]
 2A Moore's Federal Practice Sec. 8.13 (1968) (footnotes omitted)
 
 
 [44]
 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957)
 
 
 [45]
 H.R.No.91-1549, 91st Cong., 2d Sess. p. 4007 (1970)
 
 
 [46]
 Id., at p. 4725
 
 
 [47]
 394 U.S. 165, 174-175, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1968). For a more extensive discussion of Alderman and its applicability to the instant case, see III, infra
 
 
 [48]
 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1959)
 The Court in Alderman v. United States observed that "[t]he 'person aggrieved' language is from Fed.Rule Crim.Proc. 41(e). Jones thus makes clear that Rule 41 conforms to the general standard and is no broader than the constitutional rule." 394 U.S. 165, 173, n. 6, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1968).
 
 
 [49]
 The Court adds in Alderman v. United States that "Congress has not done so. In its recent wiretapping and eavesdropping legislation, Congress has provided only that an 'aggrieved person' may move to suppress the contents of a wire or oral communication intercepted in violation of the Act. Title III, Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 221 [18 U.S.C. Sec. 2518(10) (8) (1964 ed., Supp. IV)]. The Act's legislative history indicates that 'aggrieved person,' the limiting phrase currently found in Fed.Rule Crim.Proc. 41(e), should be construed in accordance with existent standing rules. See S.Rep. No.1097, 90th Cong., 2d Sess., at 91, 106." 394 U.S. 165, 175-176, n. 9, 89 S.Ct. 961, 968, 22 L.Ed.2d 176 (1968)
 
 
 [50]
 394 U.S. 165, 175-176, 89 S.Ct. 961, 967, 968, 22 L.Ed.2d 176 (1968)
 
 
 [51]
 Similarly, despite the dictum in the Court's opinion in Silverthorne Lumber Co. et al. v. United States, 251 U.S. 385 at 392, 40 S.Ct. 182, at 183, 64 L.Ed. 319 (1919), to the effect that "[t]he essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all," the Court has refused to extend the scope of the exclusionary rule to cover every proceeding under all circumstances. As Mr. Justice Harlan stated for the Court in United States v. Blue, 384 U.S. 251, at 255, 86 S.Ct. 1416, 1419, at 16 L.Ed.2d 510 (1965) "[e]ven if we assume that the Government did acquire incriminating evidence in violation of the Fifth Amendment, Blue would at most be entitled to suppress the evidence and its fruits if they were sought to be used against him at trial."
 
 
 [52]
 H.R.No.91-1549, 91st Cong., 2d Sess. p. 4725 (1970)
 
 
 [53]
 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939)
 
 
 [54]
 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1968)
 
 
 [55]
 2 Conrad, Modern Trial Evidence Sec. 934 (1956). With respect to affirmative defenses in criminal proceedings, Conrad states that "[t]hough the burden of proof in a criminal case never shifts from the state, yet, when a distinct substantive matter is relied upon as a defense, the burden of evidence rests on the accused. A defendant relying upon some independent, distinct, substantive matter of exemption, immunity, or defense beyond the essentials of the legal definition of the offense, has the onus of proof as to such matter, notwithstanding that the burden of establishing the corpus delicti is upon the state." Sec. 935 (footnotes omitted)
 
 
 [56]
 2A Moore's Federal Practice Sec. 12.08 (1968) (footnotes omitted)
 
 
 [57]
 Tate v. City of Eufaula, 165 F.Supp. 303 (M.D.Ala.1958)
 
 
 [58]
 Note 3, supra
 
 
 [59]
 Note 34, supra
 
 
 [60]
 See view of Judges Gibbons and Aldisert, dissenting in Egan, note 10, supra
 
 
 [61]
 Blackmer v. United States, 284 U.S. 421, 438, 52 S.Ct. 252, 255, 76 L.Ed. 375 (1932)
 
 
 [62]
 Garland v. Torre, 259 F.2d 545, 549 (2d Cir. 1958), cert. denied, 385 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958)
 
 
 [63]
 S.Rep.No.1097, 90th Cong., 2d Sess. 107 (1968)
 
 
 [64]
 403 U.S. 388, 414, 91 S.Ct. 1999, 2014, 29 L.Ed.2d 619 (1971) (dissenting opinion)
 
 
 [65]
 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)
 
 
 [66]
 Id., at 174, 89 S.Ct. at 967
 
 
 [67]
 Petitioner has never asserted specifically that her suspicion of wiretapping related to government action, but we assume that this is the basis of her alleged fear
 
 
 [68]
 394 U.S. 165, 175, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969) (footnote omitted)
 
 
 [69]
 Id., at 175-176, nn. 8, 9, 89 S.Ct. at 967-968
 
 
 [70]
 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920)
 
 
 [71]
 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956)
 
 
 [72]
 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958)
 
 
 [73]
 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966)
 
 
 [74]
 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)
 
 
 [75]
 Note 73, supra
 
 
 [76]
 Id., at 255, 86 S.Ct. at 1419
 
 
 [77]
 Id
 
 
 [78]
 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969)
 
 
 [79]
 403 U.S. 388, 424, 91 S.Ct. 1999, 2018, 29 L.Ed.2d 619 (1971) (dissenting opinion)